Argued December 27, 1916, reversed February 6, rehearing denied
March 6, 1917.

## FOGARTY *v.* HUNTER.*

(162 Pac. 964.)

**Corporations—Stock Subscription—Contract—Security or Payment.**

1. A contract whereby the owner of property conveyed it to a
trustee for a corporation, subject to a mortgage thereon, and to a
contract for the sale thereof, and received shares of stock in the cor-
poration, which contract expressly provided that the note given
by the trustee to the corporation for the purchase price of the land

---

*The question of payment for stock in a corporation by transfer
of property is discussed in a note in 42 L. R. A. 597.

On right of corporation to purchase its own shares of stock, see
notes in 61 L. R. A. 621; 25 L. R. A. (N. S.) 50; 30 L. R. A. (N. S.)
694; 44 L. R. A. (N. S.) 156.                          REPORTER.

was to be paid only out of the proceeds of the sale of the land, was a sale of the stock paid for by the conveyance of the land, not a sale for a price secured by the conveyance.

### Corporations—Stock—Payment in Property.

2.  Under the law of Washington, subscriptions to the stock of a corporation organized in that state can be paid in property, which is considered in good faith by the parties as equivalent to the value of the stock.

> [As to what may be received in payment for subscription to stock where payment is required in "cash," see note in Ann. Cas. 1912E, 480.]

### Corporations—Stock—Repurchase by Corporation.

3.  In a contract whereby a corporation agreed to resell part of the stock subscribed for by a purchaser, an agreement that on its failure to make such resale the corporation would pay for the stock out of the proceeds of the sale of land conveyed to it by the subscriber in payment for the stock is an agreement by the corporation indirectly to purchase its own stock, and is *ultra vires* and void where the laws of the state in which it was incorporated forbade it from purchasing its own stock.

### Corporations—Contract—Ultra Vires Provision—Effect.

4.  The invalidity of that provision merely because it was *ultra vires* does not vitiate the whole contract nor render the subscriber liable to the corporation for the amount paid him by it for a resale of part of the stock nor require him to repay the amount received by him as dividends on stock of another corporation issued in exchange for his stock.

### Mortgages—Payment by Mortgagor—Conveyance Subject to Mortgage—Subrogation.

5.  The owner of a tract of land mortgaged it and then entered into a contract for its sale on a commission by a broker who was to become entitled to the balance of the land after the owner received a stipulated sum from the sale made. Thereafter the owner transferred the land and his rights under the contract with the broker to a trustee for a corporation in exchange for stock in the corporation at a value fixed as the amount he was to receive from the broker less the amount of the mortgage. This conveyance was expressly made subject to the mortgage. Thereafter the owner to protect himself was required to pay the amount of the mortgage, and he had it assigned to a third party as trustee for him. In the meantime the broker had failed to perform his contract, and it was forfeited according to its terms. *Held* that, the rights under the contract having passed to the trustee for the corporation, the owner did not have title to the lands so as to make his payment of the mortgage a satisfaction of it, and he was entitled by subrogation to enforce it against the corporation.

### Subrogation—Payment by Mortgagor—Lien for Taxes.

6.  In such a case the owner could also foreclose the mortgage for the amount paid by him to discharge the lien for taxes, the mortgage providing that in the event of the failure of the mortgagor to

pay such taxes, the mortgagee might do so, and the amount paid should then become secured by the mortgage.

**Trusts—Conveyance of Title—Selection by Vendor.**

7. Where the owner of a tract of land subject to a mortgage contracted to convey all except a certain quantity thereof to be selected by him to a trustee for a corporation which agreed to pay the mortgage out of the proceeds of sales of the land, the title to the reserved land after it was selected by the former owner was held by the trustee as a naked trust, and he can be compelled to convey the title to the former owner.

From Multnomah: HENRY E. McGINN, Judge.

This is a suit by H. B. Fogarty, substituted for R. L. Donald, against Frank T. Hunter, Cornelia H. Hunter, the Empire Life Insurance Company, the Spanton Company, Theodore J. Seufert, Mary Seufert, William A. Healy and Frank S. Healy, in which suit W. R. Crawford and M. D. Haynes intervene as receivers of the Empire Life Insurance Company.

Department 1.   Statement by MR. JUSTICE BEAN.

Plaintiff seeks by his first cause of suit to foreclose as a first lien a mortgage of $30,000, with interest and attorney's fees, upon certain real estate described in the complaint; and by a second cause of suit to foreclose a second lien of $35,000, with interest and attorney's fees, on said real property with the exception of 32 lots.

The defendant, the Empire Life Insurance Company, and the intervening defendants, W. R. Crawford and M. D. Haynes, receivers of that company, allege in the answer that the contract is a Washington one executed and to be governed by the laws of that state, and by a cross-complaint assert that they are entitled to have the trust deed executed by Joseph M. Healy to Frank T. Hunter declared to be a mortgage in the sum of $270,000, interest and attorney's fees, and foreclosed; that the same is prior and superior to all the claims

"excepting only the mortgage of Realty Associates of Portland, Oregon, provided it shall be shown by due and sufficient proof herein that the plaintiff is the owner and holder thereof for a valuable consideration, and the amount due thereon, principal and interest, shall be established by due and legal proof."

As a second further answer and cross-complaint they allege that they are entitled to recover $7,000 paid by the insurance company to Realty Associates as interest on the $30,000 mortgage before it was assigned to Healy, and to be subrogated to the rights of the Realty Associates to that amount, with interest.

For a third further separate answer and defense it is averred:

"That said alleged agreement on the part of the defendant the Empire Life Insurance Company to resell for the said defendant Joseph M. Healy, 7,500 shares of the capital stock of the defendant the Empire Life Insurance Company, so subscribed for by the said defendant Joseph M. Healy, was given solely in consideration of the agreement on the part of the defendant Joseph M. Healy to pay to the said defendant the Empire Life Insurance Company the sum of $270,000 for the 13,500 shares of the capital stock of the defendant the Empire Life Insurance Company"; and that there has been a failure of consideration for the alleged agreement to resell the stock as Healy has failed to pay the $270,000.

For a fourth separate answer and defense it is asserted:

"That during the latter part of the year 1911, defendant Joseph M. Healy sold and delivered all of his stock, in the defendant the Empire Life Insurance Company, to the Columbus Securities Company, a New Jersey corporation, and that at the same time and as a part of the same transaction Merchants' National Bank of Portland, which, under some arrangement with defendant Joseph M. Healy, had certain shares

of the capital stock of said defendant the Empire Life Insurance Company belonging to said defendant Joseph M. Healy as collateral security for certain indebtedness and liability to it from said Joseph M. Healy, exchanged, with the consent of the said defendant Joseph M. Healy, the shares of the capital stock of said defendant the Empire Life Insurance Company so held by it as collateral security for the indebtedness and liability of the said defendant Joseph M. Healy, to it, for stock in the Columbus Securities Company, a New Jersey corporation.''

They set forth the contract between the Columbus Securities Company and Healy, and aver that by reason of the premises the insurance company is relieved from any further obligation to sell the stock of the defendant Healy and placed beyond power to comply with the contract of July 27, 1910, in that respect.

As a fifth separate answer these defendants pleaded that the contract of July 27, 1910, and that of June 6, 1911, referred to in the complaint, are Washington contracts governed by the laws of that state, which statutes are set forth in the answer. They aver:

''That the alleged indebtedness of the defendant the Empire Life Insurance Company to defendant Joseph M. Healy arose by, through and under the attempted agreement, if at all, on the part of the defendant the Empire Life Insurance Company, in said instrument of July 27, 1910, to purchase its own stock.

''That said agreement of July 27, 1910, between the defendant the Empire Life Insurance Company and the defendant Joseph M. Healy, more particularly referred to in * * the second cause of action stated in the complaint, in so far as it was, or could be, construed to be, either in law or in equity, an agreement on the part of defendant the Empire Life Insurance Company, to purchase its own stock, either by · the payment of money or by authorizing the said Frank T. Hunter, trustee, to sell the said mortgaged property described in said agreement and turn over the proceeds

of said sales, either in cash or securities, to the defendant Joseph M. Healy, in exchange for its stock, was, and is, by and under the laws of the state of Washington, above quoted and referred to, void as against public policy, illegal, fraudulent and *ultra vires* to the power of the defendant the Empire Life Insurance Company, and should be set aside and held for naught.

"That the alleged contract referred to and attempted to be set up in paragraph XI of the second cause of action stated in the complaint, under the alleged date of June 6, 1911, was, and is, by and under the laws of the state of Washington above quoted and referred to, without consideration, void as against public policy, illegal, fraudulent, and *ultra vires* to the powers of the defendant the Empire Life Insurance Company, and should be set aside and held for naught in so far as the defendant the Empire Life Insurance Company is concerned."

These defendants pray for a decree: (1) Dismissing the first and second causes of suit; (2) holding the contract of July 27, 1910, between defendant the Empire Life Insurance Company and the defendant Joseph M. Healy, in so far as it is an agreement on the part of the defendant company to purchase its own stock, and the alleged contract of June 6, 1911, between the insurance company and Frank T. Hunter and defendant Joseph M. Healy, void; (3) for a judgment against defendant Healy for the sum of $270,000, with interest thereon at the contract rate of 6 per cent per annum from July 27, 1910, and the further sum of $13,500 attorney's fees, and for costs and disbursements herein; (4) for a judgment against Joseph M. Healy for the further sum of $7,000 paid by these defendants to Realty Associates, a corporation, upon the note and mortgage, with interest; (5) that plaintiff and each of the defendants herein be foreclosed

of all right, title and interest in the mortgaged property, and that it be sold to satisfy the judgment.

By a cross-complaint the defendant Joseph M. Healy requests a foreclosure of a lien on said real estate (except 32 lots selected by him) for $57,240, and the additional sum of $34,500, with interest, less $9,100 paid thereon November 24, 1912.

The trial court held:

"That the stock subscription contract mentioned in paragraph 8 of the findings of fact, the promissory note from defendant Hunter as trustee to the defendant insurance company, mentioned in paragraph 9 of the findings, the deed from defendant Healy to defendant Hunter in trust, mentioned in paragraph 10 thereof, the contract of July 27, 1910, between the Empire Life Insurance Company and defendant Joseph M. Healy, described in paragraph 11 thereof, and the contract dated June 6, 1911, between the Empire Life Insurance Company, Frank T. Hunter, trustee, and Joseph M. Healy were at the time of their execution and now are void," and that defendant Healy was the equitable owner of the real property.

That court declined to foreclose the $30,000 mortgage and postponed it to a lien created by the court in favor of the receivers of the insurance company, aggregating $47,066.80, and held that unless this sum should be paid by Healy the first mortgage of $30,000 should be deemed satisfied and the title to the real estate should be conveyed by Frank T. Hunter, trustee, to the receivers; and that upon the payment of said sum by Healy within six months the title should be conveyed by the trustee to him.

Pending the suit Healy advanced $4,256.70 for the payment of tax liens on the property involved pursuant to the orders of the court that the same, with interest at 7 per cent should be a first lien upon the

property. No provision was made in the final decree to carry out such orders. Plaintiff and defendant Healy appeal.

A statement of the main facts relating to the several contracts and transactions involved will probably lessen the necessity of stating at a greater length the issues which are appropriately raised by the pleadings and are necessarily lengthy.

On July 27, 1910, defendant Joseph M. Healy was the owner of the realty described in the complaint, which consisted of 25 lots in Council Crest Park and 40 acres of adjoining land which at that time was unplatted. It was choice view property in and about the city of Portland. Its value was estimated in the testimony to be from $200,000 to $300,000. A mortgage for $30,000 was given by Mr. Healy to the Realty Associates, of Portland, Oregon, a corporation, covering the real estate in question. It appearing that there was a prospect of selling property of that kind at the time, on the same day a contract was entered into between Healy and the Spanton Company under which the latter was employed to effect sales of the land (except four acres thereof) on commission. In the event that Healy should receive from the sales $300,000 net, after deducting commissions, taxes, assessments and interest, with interest thereon at 6 per cent within three years from date of the agreement the title of the portion remaining unsold was to be conveyed to the Spanton Company. In case of the failure of that company to perform the contract, all its rights under the terms thereof, except as to the commissions actually earned, should be canceled and the property revert to Healy. This agreement was held in escrow by the Realty Associates. No sales were made by the Spanton people. The Spanton con-

tract was never delivered, and it is important only in that all the subsequent dealings with the property were based upon the conditions existing when it was made.

On the same date, July 27, 1910, a contract was entered into between Joseph M. Healy and the Empire Life Insurance Company which recognized the $30,000 mortgage, and provided that when the property was platted four blocks aggregating 32 lots should be conveyed to Healy subject only to that mortgage. The contract recited a subscription by Healy for 13,500 shares of the capital stock of the insurance company. As the contract shows the par value of this stock was $10 per share. The price at which it was sold to Healy was $20 per share, aggregating $270,000, the amount of money which was to come to him from the Spanton Company under the contract for the sale of the real estate. Healy signed the usual form of stock subscription with the indorsement thereon referring to the contract, and the subscription and agreement of July 27, 1910, are to be read together as one contract. It provided that Healy should deed the property to Frank T. Hunter who should hold it in trust for the purpose of carrying out the provisions of the contract; and expressly provided that the insurance company should succeed to all the rights of Healy under his contract with the Spanton Company. By paragraph 11 thereof the money arising from the sale of the real property was to be first applied to the payment of the $30,000 mortgage, and further, that in case the said mortgage should not be paid by sales of the property, the insurance company would pay it out of its own funds. By paragraph 12 the insurance company, within six months from the date of the contract, was to sell 7,500 shares of the stock subscribed by Healy

and issued to him at a price not less than $20 a share. In paragraph 13 it was agreed that if the insurance company should fail to pay Healy the $150,000 arising from the sale of the stock in question within six months from the date of the contract that that amount or so much of it as remained unpaid should be realized from the sale of the real property after the $30,000 mortgage had been liquidated. By the agreement Hunter was to execute in favor of the insurance company a note for $270,000, being the purchase price of the property under the Spanton contract less the $30,000 mortgage which was accepted as a first lien on the property. Healy's name did not appear on this promissory note and the contract expressly provided that he should in no event be personally responsible or liable for the payment of said sum. The contract also stipulated that Frank T. Hunter, trustee, should not be personally liable, but that the insurance company should look solely to the security (the real estate and proceeds thereof) in the hands of the trustee for the payment of the note of $270,000.

In accordance with the provisions of this contract a deed was executed by Healy including the four acres or 32 lots to which he was entitled whereby the property was transferred to Frank T. Hunter, the land at that time not being platted. Mr. Hunter executed a declaration of trust setting forth, in substance, that the property was held by him in trust for the purpose of carrying out the provisions of the contract of July 27, 1910.

Later the realty was platted as Healy Heights at the instance of the Spanton Company and the dedication was made by Hunter pursuant to the provisions of the contract. Afterward, with the consent of Mr. Riner, who had succeeded to the rights of the Spanton

Company and of Mr. Hunter, who represented the insurance company, Mr. Healy selected the 32 lots to which he was entitled. The lands chosen were sites 2, 3, 4, 5, 6 and 7 in section 1; sites 8, 9, 10 and the north half of site 11 in section 3; and sites 5, 6, 7 and 8 in section 8 on the plat of Healy Heights.

During the six months subsequent to July 27, 1910, the insurance company sold stock belonging to Healy for the aggregate amount of $22,760, leaving a balance of the $150,000 amounting to $127,240.

Thereafter Healy became indebted to the Merchants' National Bank of Portland in the sum of $70,000, and as security therefor he gave an order on the insurance company and Frank T. Hunter, trustee, which was accepted. The contract between the insurance company and Healy was supplemented by a further contract on June 6, 1911, providing that after the payment of the $30,000 mortgage, the first sum of $57,240 arising from the sale of either the land or the stock as above mentioned was to be paid to Healy, and the remaining $70,000 to the Merchants' National Bank in payment of his indebtedness to it. Of these amounts, aggregating $127,240, the claim for $35,000 was assigned by the bank to plaintiff and constitutes his second cause of suit. The balance is claimed by Healy in his cross-complaint.

In the fall of 1911 at the solicitation of the insurance company through the defendant Hunter, Healy consented to the exchange by the insurance company of the remainder of his stock in that corporation for stock in the Columbus Securities Company. At the same time and under the same circumstances the Merchants' National Bank consented to a similar exchange of stock. Glowing representations were made as to

the financial strength of the Columbus Securities Company to the effect that Healy would be paid the moneys due him, both the $30,000 and the $127,240. When a witness on the stand, Mr. Hunter stated that the Columbus Securities Company was all "hot air." In February, 1913, that company became insolvent with liabilities largely in excess of its assets. This forced the insurance company into the hands of receivers. W. R. Crawford and M. D. Haynes were appointed as such receivers.

In the summer of 1912, the Realty Associates, the holder of the $30,000 mortgage on the property, demanded payment from the insurance company. Foreclosure was threatened, and in order to protect his credit Mr. Healy purchased the mortgage. It remained in the name of the Realty Associates until shortly before this suit was commenced when it was assigned by that corporation to R. L. Donald. He gave a declaration of trust to the Realty Associates, and it in turn gave a like declaration to Joseph M. Healy. After the case had been tried in the Circuit Court Mr. Donald assigned the mortgage to H. B. Fogarty, who holds the same in trust and who has been substituted as plaintiff.     AFFIRMED. REHEARING DENIED.

For appellants there was a brief over the name of *Messrs. Snow & McCamant,* with an oral argument by *Mr. Wallace McCamant.*

For respondents, W. R. Crawford and M. D. Haynes, as Receivers, there was a brief over the names of *Mr. H. G. Platt, Mr. Hugh Montgomery* and *Mr. Palmer L. Fales,* with oral arguments by *Mr. Platt* and *Mr. Montgomery.*

MR. JUSTICE BEAN delivered the opinion of the court.

It is the contention of plaintiff and Healy that the land was conveyed and the latter's interest in the Spanton contract was assigned to the insurance company and that the same was accepted in payment of his stock subscription; while it is maintained by the receivers for the insurance company that the real estate was transferred by a deed in trust executed by Joseph M. Healy to Frank T. Hunter, trustee, as security for the payment of the stock.

We will first consider the contract of July 27, 1910. In so far as material to the controversy, its phraseology is as follows:

"Whereas, the party of the first part [Healy] is the owner in fee simple of the following described land in the county of Multnomah, state of Oregon, to wit: [Description follows]—subject to a first mortgage thereon for $30,000 to Realty Associates of Portland, Oregon; * * Now therefore, this agreement witnesseth: In payment for said subscription of thirteen thousand five hundred (13,500) shares of the capital stock of the party of the second part, the party of the first part has caused Frank T. Hunter, of Seattle, county of King, State of Washington, as trustee, to execute and deliver to the party of the second part, his promissory note, payable to the order of the party of the second part, for the sum of two hundred seventy thousand ($270,000) dollars, drawing interest at six (6%) per cent per annum, from the date of the issuance of said stock, and delivery to him of the stock certificates of the party of the second part representing the same, and as security for said note has executed and delivered contemporaneously herewith, to said Frank T. Hunter, as trustee, a trust deed covering all of the above-described real property, subject to said mortgage for $30,000, drawing interest at eight (8%) per cent per annum from July 28, 1910, and subject to the terms and conditions of said contract, 'Exhibit

A,' between the party of the first part and Spanton Company.

"II. The party of the second part [the Empire Life] agrees to and with the party of the first part that it will cause Frank T. Hunter, trustee as aforesaid, to make conveyance of said lands from time to time as the same shall be sold, said sale to be at prices to be agreed upon between the party of the first part and said Spanton Company, in accordance with the terms of 'Exhibit A'; the terms of sale to be likewise in accordance with the provisions of 'Exhibit A,' or for cash.

"III. The party of the second part further agrees that the first thirty thousand ($30,000) dollars derived from the sale of said lands in excess of the commission thereon going to said Spanton Company, and the said moneys necessary to keep said property free and clear from liens, together with eight (8%) per cent interest on said thirty thousand ($30,000) dollars to the date of payment, as provided in said mortgage, shall be used to fully liquidate and pay off said first mortgage of thirty thousand ($30,000) dollars, with interest, as aforesaid; it being understood and agreed that all payments, thereafter derived from the sale of the property, after deducting said fifteen (15%) per cent and said moneys necessary to pay taxes and assessments and all other amounts necessary to keep said property free from liens, shall be paid to the party of the second part, as above provided, until the full sum of two hundred seventy thousand ($270,000) dollars, together with six (6%) per cent interest thereon, as above provided, has been paid to the party of the second part.

"IV. Upon the said sum of two hundred seventy thousand ($270,000) dollars having been fully repaid, in manner aforesaid, to the party of the second part, the party of the second part agrees to cause said Frank T. Hunter, trustee as aforesaid, to convey all of the balance of said land, and turn over all the securities then on hand representing the land theretofore sold to Spanton Company, and its receipt shall

be a full discharge to the party of the second part hereunder.

"V. It is mutually understood and agreed that all notes, mortgages and contracts for portions of said land sold on deferred payments shall be made payable either to the order of said Frank T. Hunter, trustee, or to the order of the party of the second part, and the party of the second part may either hold the same as collateral security for said two hundred seventy thousand ($270,000) dollars, or such portion thereof as then remains unpaid, or, by making a credit thereon, it may become the sole owner thereof, freed from said trust.

"VI. It is mutually understood and agreed that said Frank T. Hunter, trustee, as aforesaid, will execute and deliver to the party of the second part his trustee's note for two hundred seventy thousand ($270,000) dollars, drawing six (6%) per cent, interest from the date of the delivery of said stock certificates, payable to the order of the party of the second part.

"VII. It is further mutually understood and agreed that all rights that the party of the first part has against Spanton Company and control over it, as provided in 'Exhibit A,' shall, upon the execution thereof, and deeding of said land to said Frank T. Hunter, as trustee, be transferred to and conferred upon the party of the second part, and for that purpose, the party of the first part hereby sells, assigns, transfers and sets over to the party of the second part all his rights, title and interest in and to said contract, 'Exhibit A,' with said Spanton Company.

"VIII. It is further mutually understood and agreed that the two (2%) per cent for collection services and two and one half ($2.50) dollars per deed in said contract with said Spanton Company directed to be paid to Realty Associates of Portland, Oregon, as compensation for its services, shall be equally divided between said Realty Associates, of Portland, Oregon, and said Frank T. Hunter, trustee, and it is mutually understood and agreed that said Realty Associates of Portland, Oregon, will attend to the col-

lection of the moneys flowing from the sale of said lands, the bookkeeping connected therewith, and the reporting and accounting therefor to the parties entitled thereto, and that the other duties contemplated in said contract with said Spanton Company to be performed by said Realty Associates of Portland, Oregon, shall be performed by said Frank T. Hunter, trustee.

"IX.    The party of the second part agrees to and with the party of the first part that at any time after the payment of said sum of thirty thousand (\$30,000) dollars, and the release of said mortgage securing the same, it will cause said Frank T. Hunter, trustee, to convey to the party of the first part, or as he shall direct, four (4) blocks, aggregating thirty-two (32) lots, out of said property, as the same shall be platted and dedicated, without receiving compensation therefor and pursuant to the reservation contained in said contract between the party of the first part and said Spanton Company.

"X.    The party of the second part further agrees to and with the party of the first part that it will cause said Frank T. Hunter, trustee, to dedicate, as by law required, the said premises above described, and to execute a proper instrument of dedication, whenever called upon to do so by said Spanton Company.

"XI.    The party of the second part further agrees to and with the party of the first part that if said thirty thousand (\$30,000) dollars, with eight per cent (8%) interest thereon, as above provided, due said Realty Associates of Portland, Oregon, or any part thereof, shall not be fully liquidated by sales of said property at the time of the maturity thereof, and an extension of time for the payment thereof cannot be obtained from the said mortgagee, it will take up and pay off the same to said Realty Associates of Portland, Oregon, and shall thereupon be subrogated to all the rights of said Realty Associates of Portland, Oregon, either by an assignment of said note and mortgage, or by the terms of this instrument, and thereafter shall be first repaid from the subsequent

sales of said property, the same as though it had been the original mortgagee named in said mortgage in the place and stead of said Realty Associates of Portland, Oregon.

"XII. The party of the second part agrees within six (6) months on and after the date hereof, to resell, for the party of the first part, seventy-five hundred (7,500) shares of the said capital stock at not less than a price of ten ($10) dollars per share and ten ($10) dollars surplus, aggregating one hundred fifty thousand ($150,000) dollars, and in settlement of the sale thereof, to either account to the party of the first part in cash or in negotiable paper of good and solvent makers. It is understood and agreed, however, that in making this agreement to sell said seventy-five hundred (7,500) shares of its capital stock for account of the party of the first part, the party of the second part does not agree to pay any interest thereon.

"XIII. The party of the second part agrees that, if at the expiration of said six (6) months on and after the date hereof, it has not resold for account of the party of the first part all of said seventy-five hundred (7,500) shares of said capital stock of the party of the second part, it will forthwith instruct said Frank T. Hunter, trustee, to pay over to the party of the first part from all moneys or the proceeds of securities then on hand or thereafter received from the sales of said property such sum or sums, which, taken with the proceeds of any portion of said seventy-five hundred (7,500) shares theretofore or thereafter sold and accounted for to the party of the first part, shall amount to one hundred fifty thousand ($150,000) dollars, together with interest on the unpaid portion of said one hundred fifty thousand ($150,000) dollars at the rate of six (6%) per cent per annum, from the expiration of said six (6) months' period, and the party of the first part agrees, as fast as said payments shall be made, to turn over to said Frank T. Hunter, trustee, the balance of said seventy-five hundred (7,500) shares of stock, free and clear of any claim on behalf of the party of the first part.

"XIV. It is specially understood and agreed that the party of the first part shall in no event be held personally responsible or liable for the payment of said sum of two hundred seventy thousand ($270,000) dollars, or any part thereof, but the party of the second part expressly covenants and agrees to look only to said security placed in the hands of said trustee, as above set forth, for the payment of said two hundred seventy thousand ($270,000) dollars. * * *"

All the several contracts are set forth at length in the record. It would occupy too much space to fully portray them here. This contract became effective in the State of Washington where it was delivered. We should look, therefore, to the laws of that state in construing the same.

1. As we construe the contract in question, Healy traded the real estate described therein subject to the $30,000 mortgage and subject to the conditions of the Spanton contract to the insurance company for 13,500 shares of the capital stock of that company. The real property, together with the 4 acres, or 32 lots reserved by Healy in the Spanton contract, and in the contract of exchange of July 27, 1910, was conveyed by Healy to Frank T. Hunter, as trustee, who was to dispose of and convey the land so exchanged under the direction of the insurance company.. Except for the shares of stock and the 32 lots which he held for Healy, Hunter held the title to the land for and as the trustee of the insurance company. It appears that in no event and under no circumstances contemplated by the contract was the land (except the part reserved) to revert to or be reconveyed to Healy, nor was the insurance company stock to revert to that company. There was no right of redemption of the land in Healy under the terms of the several contracts or as shown by the evidence in the case. According to the specific

terms of the contract providing therefor, the note of the trustee for $270,000 given to the insurance company was a mere form. Hunter, the trustee, was not personally liable thereon, Healy did not sign the same, and it was expressly stipulated that the latter should in no event be held responsible or liable for the payment of the $270,000 or any part thereof. It appears to have been a convenient way to arrange for the carrying out of the Spanton contract to have the title to the land conveyed to Hunter as trustee instead of direct to the insurance company. All the proceedings indicate that it was then expected that sales of the land would be made, and that it was thought that conveyances of the different parcels could more conveniently be executed by Hunter at the direction of the insurance company than for the corporation to be burdened with those details. The note simply represented the real property and the proceeds that might be received therefor held by the trustee to which the insurance company covenanted to look solely for the payment of the $270,000. There was no debt from Healy to the insurance company to be secured. None was ever claimed by or on behalf of the insurance company prior to this suit. On the other hand the officers of the Empire Life Insurance Company recognized that it was indebted to Healy. The note was security only in name. In such a case a court of equity will look behind the mere form of the transaction and treat it in the light of its real character. Healy was not simply purchasing the stock but rather disposing of his real estate. The transaction was an absolute exchange or payment for the shares of stock in real property.

2. Under the decisions of the State of Washington a stock subscription to a Washington corporation may

be made in property which is considered in good faith by the parties concerned as equivalent in value to such stock: *Turner* v. *Bailey,* 12 Wash. 634 (42 Pac. 115); *Kroenert* v. *Johnston,* 19 Wash. 96 (52 Pac. 605); *Gold Ridge Mining & Dev. Co.* v. *Rice,* 77 Wash. 384, 386 (137 Pac. 1001); *Northern Bank & Trust Co.* v. *Day,* 83 Wash. 296 (145 Pac. 182). Such a payment for stock is usual and lawful: 1 Cook on Corporations, (7 ed.), § 18. The insurance company and Healy having made the lawful contract of July 27, 1910, they and their successors are bound by it.

3. Passing to the agreement to resell the stock, the contract of July 27, 1910, relates to several transactions to take place in the future. As to that part of the memorandum agreement (paragraphs 12 and 13) where the insurance company agreed within six months to resell for Healy 7,500 shares of the capital stock at not less than $20 a share aggregating $150,000, and in the event of its failure to make such sale, it stipulated as follows:

"It will forthwith instruct said Frank T. Hunter, trustee, to pay over to the party of the first part from all moneys or the proceeds of securities then on hand or thereafter received from the sales of said property such sum or sums, which, taken with the proceeds of any portion of said seventy-five hundred (7,500) shares theretofore or thereafter sold and accounted for to the party of the first part, shall amount to one hundred fifty thousand ($150,000) dollars, together with interest on the unpaid portion of said one hundred fifty thousand ($150,000) dollars at the rate of six (6%) per cent per annum from the expiration of said six (6) months' period."

This was, in effect, an agreement to pay Mr. Healy out of the proceeds of its own property a certain amount of money for some of its own stock in the

event that it did not sell such stock within a fixed period of time. The statute of Washington provides that no such life insurance company shall invest any of its funds in its own stock, and it is a familiar principle of law that a corporation may not do indirectly what it is prohibited from doing directly. It was in effect an attempted underwriting of the sale of property. This was in direct contravention of the Washington statute. We also note that this is purely a speculative feature contemplated by the memorandum. If a sufficient amount of the real estate should not be sold so as to make such transfer, no forfeiture, nor any other arrangement to carry out the proposed deal is provided for. The insurance company did issue the designated instructions to Hunter, but they were of no avail. Healy was to assist in the sale of the lands by fixing the price at which the lots were to be sold, but he did not guarantee that the lands would be sold at any particular price or at all. A kind of working program seems to have been mapped out. As to the provision for the resale of the stock unless actually made it would amount to no more than a "puffing" of the price of the same. However this may be, the statute of Washington provides, among · other things, as follows:

"Nor shall such life insurance company invest any of its funds in its own stocks, or in the stock of any other insurance companies. * * No such company shall subscribe to or participate in any underwriting of the purchase or sale of securities or property."

The courts of the State of Washington hold that a corporation cannot traffic in its own stock: *Brenaman* v. *Whitehouse et al.,* 85 Wash. 355 (148 Pac. 24). If sales of the land had been made so that finances would have permitted the insurance company to repurchase

the stock that company was inhibited by the laws of the State of Washington from trafficking in its own stock: *Kom* v. *Cody Detective Agency,* 76 Wash. 540 (136 Pac. 1155, 50 L. R. A. (N. S.) 1073), and cases there cited; 1 Morawetz, Private Corporations (2 ed.), § 112.

We are of the opinion that the contract and the dealings in regard thereto, including the security given to the Merchants' National Bank, were made with reference to the laws of the State of Washington; that the stipulation contained in paragraphs 12 and 13 and in the contract of June 6, 1911, relating to the resale of the stock traded for was *ultra vires* the powers of the insurance company and void, and should be eliminated in construing the contract. This holding is in accordance with the plea of the defendant receivers.

4. In *Central Transp. Co.* v. *Pullman's Car Co.,* 139 U. S. 24, 60 (11 Sup. Ct. 478, 488, 35 L. Ed. 55), after a thorough discussion of the law as held in many cases, Mr. Justice GRAY said:

"A contract *ultra vires* being unlawful and void, not because it is in itself immoral, but because the corporation, by the law of its creation, is incapable of making it, the courts, while refusing to maintain any action upon the unlawful contract, have always striven to do justice between the parties, so far as could be done consistently with adherence to law, by permitting property or money, parted with on the faith of the unlawful contract, to be recovered back, or compensation to be made for it."

The invalid covenant being disposed of, the other provisions of the contract of July 27, 1910, are left unimpaired. It does not follow that the stipulation for the resale whether it was for show or whatever its intended purpose, would vitiate the contract of

exchange which had largely been executed; nor is such a claim made by the plea of the receivers: See *Quartz Glass & Mfg. Co.* v. *Joyce,* 27 Cal. App. 523 (150 Pac. 648, 650); *White Mountain R. R. Co.* v. *Eastman,* 34 N. H. 124; *Kom* v. *Cody Detective Agency, supra.*

The land was conveyed by Healy to a trustee for the insurance company which has for a long time had complete dominion and control over the same; and the shares of stock were issued to Healy and were disposed of with his consent and approval.

The finding and decree of the trial court went further than as claimed by the pleadings of the defendant receivers and held the entire contract of exchange void, not, however, for the reason that it was *ultra vires* but on account of what it considered an overvaluation of the real property. We do not find any issue raised by the pleadings in regard to such an overvaluation. It, however, may be said that the evidence shows that the value of the real estate at that time was in excess of the par value or real value of the stock traded for.

During the six months subsequent to July 27, 1910, the insurance company sold for Healy 1,138 shares of the capital stock held by him for the sum of $22,760, and turned over this sum to him. Healy delivered the stock, which in so far as the record discloses has passed beyond recall and is held by parties not interested in this case. This sum was not paid out of the funds of the insurance company and did not belong to it. The only equity that the insurance company could possibly have in this transaction would be a commission or compensation for making the sale. It is not shown what exertion was made or expense incurred in making the deal. The Circuit Court decreed that this amount should be paid by Healy, not to the

parties who had purchased the stock, but to the receivers of the insurance company. This stock belonged to Healy. It was not owned by the insurance company and in equity the money should not be paid to that company nor to its receivers.

The mushroom capital stock of the Columbus Securities Company was accompanied by an income certificate from that company guaranteeing to plaintiff Healy interest at the rate of 7 per cent per annum for a period of 20 years upon the exchange value of stock. Apparently in order to keep the stock afloat and before the bubble burst and the securities company became insolvent, that company paid interest thereon to Healy amounting to $17,306.80. This is all the benefit Healy ever received from such stock. The decree of the lower court provided that this sum should be paid to the insurance company. According to our construction of the contract herein indicated, this should not be required. This money did not belong to the Empire Life Insurance Company.

5. We come next to the consideration of the $30,000 mortgage. It is contended on behalf of the receivers, under the provision in the contract of July 27, 1910, that the insurance company should turn over to the Spanton company all property remaining after the payment of the $270,000, and the provision in the Spanton contract to the effect that, if the Spanton Company did not perform its contract, all its rights should terminate, and that perforce the land would revert to Healy, that, as the Spanton contract was never performed, but was forfeited, therefore the rights thereunder reverted to Healy, that the legal ownership of the real property in question has at all times remained in Joseph M. Healy, that when defendant Healy as such owner paid the $30,000 mortgage he was

paying his own indebtedness and the mortgage became extinguished. This contention in regard to the Spanton contract leaves out of consideration the stipulation in the contract of July 27, 1910, to the effect that the insurance company should succeed to all rights that Healy had against the Spanton company by virtue of the Spanton contract, which was assigned by Healy to the insurance company. When the Spanton Company failed to acquire the right to all the land and the proceeds thereof over and above the payment of the $300,000, such right passed to the insurance company.

As we have before indicated the title to the land in question was transferred by Joseph M. Healy to Frank T. Hunter, trustee, by an absolute deed of conveyance, which was made subject to the mortgage given by Healy to the Realty Associates to secure his note for the sum of $30,000. The mortgage was given to secure a *bona fide* debt owing to that concern by Healy. The contract of July 27, 1910, evidencing the right of the insurance company to the real property plainly recognized the validity of this mortgage and provided that the rights of that company were subject to it. The eleventh paragraph of the contract contains an agreement on the part of the insurance company to pay said mortgage from its own funds in case it should not be paid from the proceeds of the sales of the property in Healy Heights. The courts and the text-book writers recognize and announce the principle governing in such a case as stated in 3 Pomeroy's Equity Jurisprudence (3 ed.), Section 1205, as follows:

"Where a mortgagor conveys by a deed which states simply that the conveyance is 'subject to' a certain specified mortgage, or words to that effect, the grantee takes the land burdened with the lien. As

between himself and the grantor mortgagor, the land is the primary fund out of which the mortgage debt should be paid; he cannot claim that the mortgagor should pay off the mortgage and thus exonerate the land. * * A grantee who thus takes a conveyance subject to a mortgage is presumed to have included the mortgage debt in the purchase price, and is not, therefore, permitted to dispute the validity of the mortgage; in this respect he is in the same position as one who expressly assumes the mortgage.''

See *Title etc. Co.* v. *Wrenn,* 35 Or. 62 (56 Pac. 271, 76 Am. St. Rep. 454); *Bronson* v. *La Crosse etc. Co.,* 2 Wall. 283, 310, 311 (17 L. Ed. 725); *Jerome* v. *McCarter,* 94 U. S. 734, 736 (24 L. Ed. 136); *Horton* v. *Davis,* 26 N. Y. 495; *Pratt's Exr.* v. *Nixon,* 91 Ala. 192, 198 (8 South. 751, 753); *Central Bank* v. *Hazard* (C. C.), 30 Fed. 484, 486; *Miss. Val. Trust Co.* v. *Washington etc. R. Co.* (D. C.), 212 Fed. 776.

The mortgage was not paid. The Realty Associates demanded its money and for his own protection Healy, who had assigned the note, was obliged to pay the debt which he did on August 3, 1912, two years after the conveyance to Hunter, as trustee, for the insurance company which agreed to take care of this mortgage debt. Healy manifestly intended to preserve his right to be subrogated to the rights of the Realty Associates by an assignment of the mortgage. Subsequently the note and mortgage were assigned to R. L. Donald, trustee, for Healy's benefit. According to the principles of equity and fair dealing, the insurance company and its receivers should not be permitted to take advantage of their own default and secure an interest in the real estate in dispute free from the lien of the mortgage. Under the circumstances enumerated Healy or his trustee is entitled to enforce the mortgage.

It is stated in 27 Cyc. 1329, as follows:

"After a mortgagor has sold his equity of redemption in the mortgaged premises, the grantee taking subject to the mortgage or assuming and agreeing to pay it, or after it has been sold on execution such mortgagor may take an assignment of the mortgage without discharging it, and hold it as a valid lien against the property."

1 Jones, Mortgages (6 ed.), § 861a, reads thus:

"If the mortgagor takes an assignment of a mortgage after the premises have been sold subject to the mortgage, the mortgage is not thereby discharged so that it cannot be enforced against the property. 'When the estate was sold subject to the mortgage, the mortgage was left as a primary charge upon the land, although the grantee did not make herself personally liable for it by assuming it. The grantor, who was the maker of the mortgage note, was entitled to have the mortgaged property applied in payment of it. To protect her own interests she might take an assignment of the mortgage and the debt and enforce the mortgage by a foreclosure as effectually as if she was not the maker of the note.' "

The case of *Pratt* v. *Buckley,* 175 Mass. 115 (55 N. E. 889), is so strictly in point that we quote at length from the opinion:

"On March 3, 1893, Alice M. Pratt was the owner in fee of the property in dispute, and she mortgaged it to one Gould to secure the payment of $850. On March 7th of the same year she conveyed the premises to one Robinson by a deed which recited that the land was conveyed subject to a mortgage, and which excepted the mortgage from the covenant of warranty and the covenant against encumbrances. Afterwards the mortgagee notified her that the note was unpaid, and that, if it was not satisfactorily arranged at once, she should foreclose the mortgage and hold her responsible for any deficiency in the payment of the

note. Accordingly, to protect herself, she caused the amount of the note to be furnished said Robinson on the execution of an assignment of the mortgage to one Swain, which, with the note, was delivered to her agent, she intending to preserve her rights as assignee of the mortgage. Afterwards Swain assigned the mortgage to her and she foreclosed it. * * The principal question in the case is whether the transfer of the note and the assignment of the mortgage to the original mortgagor after the premises had been sold subject to the mortgage constituted in law a discharge of the mortgage, so that it could not be enforced against the property. We think it very clear that they did not. * * To protect her own interests she might take an assignment of the mortgage and the debt, and enforce the mortgage by a foreclosure as effectually as if she was not the maker of the note."

The same principle was announced and applied in the following cases: *Barker* v. *Parker,* 4 Pick. (Mass.) 505; *Baker* v. *Northwestern Loan Co.,* 36 Minn. 185 (30 N. W. 464); *Stillman's Executors* v. *Stillman,* 21 N. J. Eq. 126; *Gerdine* v. *Menage,* 41 Minn. 417 (43 N. W. 91); *Kay* v. *Castleberry,* 99 Ark. 618 (139 S. W. 645, 648).

The transfer of the mortgage to Donald, as trustee for Healy, did not satisfy it. The land at that time was owned by a third party and the mortgage was a valid encumbrance thereon. Healy stood in the situation of a surety on the note and in order to protect his own interest and credit could pay the debt and have the same and the mortgage securing it assigned to a trustee for his own benefit and have the mortgage enforced by a foreclosure as effectually as though he were not the maker of the note: Harris, Subrogation, § 651. Healy then had no title to that part of the land in dispute. The mortgage, therefore, did not merge with the legal title either under the rule stated in *Katz*

v. *Obenchain,* 48 Or. 352 (85 Pac. 617, 120 Am. St. Rep. 821), cited by counsel for the defendant receivers, or otherwise.

The insurance company in part performance of their agreement paid $7,000 interest on the mortgage to July 27, 1913. The evidence shows that the sum of $2,500 is a reasonable amount as attorney's fees in this suit for foreclosing the mortgage.

6. During the progress of the litigation in accordance with several orders made by the trial court Healy paid the taxes on the property in dispute to protect the title thereof. The purport of the order passed on the 4th and 6th of November, 1914, is shown by the following excerpts therefrom:

"It is considered, ordered, and adjudged that the defendant Joseph M. Healy be, and he is hereby authorized and empowered to redeem the following described real property from the following described tax liens thereon, to wit: [Here follows a description of the tax liens]. * * It is ordered and decreed by the court that the advances made by the defendant Joseph M. Healy for the payment of taxes protected under an order and decree heretofore entered shall bear interest at the rate of 7 per cent per annum pursuant to the proposition contained in the petition of the said Joseph M. Healy, and that the interest shall be protected in like manner with the principal."

On August 30, 1915, a portion of the order passed by the trial court reads thus:

"It is adjudged and decreed that the amounts expended by the said Joseph M. Healy in payment of the said taxes, together with 7 per cent interest thereon, are a first lien and encumbrance on the real property described in the complaint and in the cross-bill of the defendant Joseph M. Healy, and that the said moneys be first paid to the said Joseph M. Healy out of the sale of the property described in the complaint and the

cross-bill prior to any and all other claims set forth in the complaint and in the cross-bill.''

The mortgage given to the Realty Associates dated July 27, 1910, contained a provision to the effect that the mortgagor would pay all taxes lawfully levied on the property, and that in case the mortgagor should fail so to do, the mortgagee might pay the same, and the amount so paid with interest at 8 per cent per annum thereon would be payable by the mortgagor at the payment of the next installment of interest and that the said land should be part of the debt secured by the mortgage and a lien upon the land. Pursuant to the several orders of the court Healy paid taxes lawfully levied on the property as follows:

| | |
|---|---:|
| November 7, 1914 | $2,196.85 |
| November 20, 1914 | 1,005.85 |
| January 7, 1915 | 335.99 |
| August 31, 1915 | 718.01 |
| Aggregating | $4,256.70 |

—which amount Healy is entitled to, with interest at 7 per cent per annum from the several dates of payment upon the respective amounts, and which he is entitled to have declared a first lien upon the real property in controversy.

7. It was provided in the agreement made by Joseph M. Healy with the Spanton Company that 4 acres of the land should be excepted from the sale. Pursuant to this reservation by the ninth paragraph of the contract of July 27, 1910, the insurance company agreed with Healy that at any time after the payment of the $30,000 mortgage it would cause the trustee to convey to Healy, or as he should direct, 4 blocks aggregating 32 lots out of the property as platted and dedicated

without compensation pursuant to the reservation in the Spanton contract. In accordance therewith Healy selected the property as above stated. Hunter was a naked trustee for Healy of these tracts of land. While the lots are subject to the lien of the $30,000 mortgage the contract of July 27, 1910, plainly provided that this mortgage should be paid from the proceeds of the other portion of the real estate. Healy is entitled to a deed from Frank T. Hunter, trustee, conveying the 32 lots above described.

The claim of plaintiff assigned by the Merchants' National Bank being for a portion of the amount agreed to be paid to Healy on account of a resale of the stock in the insurance company falls with the elimination of the contract for the resale contained in said paragraphs 12 and 13, and in the contract of June 6, 1911. The claim for the balance of such payment made by defendant Healy in his answer and cross-complaint falls for like reason.

The decree of the lower court will therefore be reversed, and one entered here in accordanc with this opinion: First, requiring Frank T. Hunter, trustee, to make, execute and deliver a deed of conveyance of the 32 lots described above to Joseph M. Healy, or as he may direct; second, foreclosing as a first lien the taxes amounting to $4,256.70, with interest as above stated; third, foreclosing the mortgage of $30,000, with interest from July 27, 1913, at 8 per cent per annum, and $2,500 attorney's fees, as prayed for in the complaint. In the event of the payment by the insurance company, or its receivers, of the several amounts above specified, with interest, costs and expenses incurred, then Frank T. Hunter, trustee, is authorized to make, execute and deliver a deed of conveyance of

the real property, excepting the 32 lots, to the receivers of the defendant insurance company.

REVERSED.    REHEARING DENIED.

MR. CHIEF JUSTICE MOORE, MR. JUSTICE BURNETT and MR. JUSTICE HARRIS concur.