Argued October 18, 1929; affirmed April 8; rehearing denied
October 7, 1930

# MAY ET AL. *v.* ROBERTS

(286 P. 546)

*L. A. Liljeqvist* of Marshfield (Cake & Cake and L. A. Liljeqvist of Portland, on the brief) for appellant.

*Bartlett Cole* of Portland for respondent Chassy.

*John Manning* of Portland (Manning & Harvey and I. N. Smith, all of Portland, on the brief) for other respondents.

BEAN, J.  This is a suit to set aside two judgments rendered in the circuit court for Multnomah county on April 2, 1920; one in favor of Joseph C. Roberts and the other in favor of Carl R. Jones company against D. K. May and the Gibson Mining company on the ground of imperfect service of summons and complaint and that the judgments were fraudulently obtained and void.

The circuit court entered a decree setting aside the judgments and requiring Roberts to account to plaintiffs for their interest in the property taken away from the Gibson Mining company and decreeing that Roberts became a trustee ex maleficio of the property.  From this decree the defendant appeals.

In January, 1918, Mrs. Minnie M. May came to Portland to interest individuals in furnishing money

for the development of certain mining claims in the province of British Columbia, Canada. She got in touch with Joseph C. Roberts and through him and the Carl R. Jones company in which Roberts was interested with certain individuals; among others, S. Solomon, H. G. Colton, T. E. McHolland, C. M. Pierson, R. H. Hughes, M. L. Jones, James D. Hail and John H. Haak, who advanced certain sums of money under agreements substantially in form like the following:

"Portland, Oregon.

"This is to certify, that S. Solomon of Portland, state of Oregon, has this day purchased 10,000 shares of stock fully paid up and non-assessable, of the Gibson Mining Company, Limited, of Kaslo, B. C., at 20 cents per share. At the expiration of 12 months from date hereof, if he is not satisfied with his investment and elects to do so, we hereby agree and will return to S. Solomon, or his order, the sum invested by him and amounting to $2,000, together with 8 per cent interest from date hereof, upon surrender of the stock and this agreement.

"Dated this 25th day of May, 1918.
"Gibson Mining Company, Limited.
"D. K. May, Pres."

At first the agreements provided for a return of the money if the purchasers were dissatisfied and exercised their rights within 18 months from February 21, 1918, with interest at 8 per cent. Later the time was cut down to 12 months.

The Gibson Mining Company, Limited, was incorporated on March 6, 1918, and was granted a certificate to do business and commenced to do business on May 25, 1918.

During the year 1919 a group of stockholders in the Gibson Mining company, consisting of defendants,

Joseph C. Roberts, Robert Gunning and others, developed a plan to acquire all of the physical assets of the Gibson Mining company for their own benefit through legal proceedings to be instituted in court and in January, 1920, they reduced the agreement to formal writing, which was referred to in the record as the "Conspiracy Contract." This agreement recites, in part, as follows:

"That, Whereas, it is the purpose of the parties hereto to acquire the legal title to, and to hold, operate and develop the following described mining claims located in the province of British Columbia, Dominion of Canada, to wit: * * *

"It being the intention to include in this agreement all mining claims full or fractional heretofore embraced in the group known as the Gibson Group of which the Gibson Mining Company, Limited, claims to hold title to, or interest in. * * *

"And whereas, a one-quarter interest in the said properties has heretofore been acquired by the parties hereto from J. M. Wolbert, the conditions of said purchase being among other things that the parties hereto shall prosecute certain actions or suits against one Louis Chassy, of Spokane, Washington, who holds or claims to hold a one-quarter interest in said properties, described as aforesaid, and whose interest the parties hereto are seeking to either extinguish or acquire by purchase. * * *

"It is understood that all of the suits or actions now pending or to be instituted against the Gibson Mining Company, Limited, D. K. May or Minnie M. May or Louis Chassy are to be prosecuted with the utmost diligence by the parties of the second part and said parties of the second part shall be bound to exercise all due care and caution in prosecuting and handling any of said suits or actions in the acquisition of the rights of any parties averse to the parties hereto."

Joseph C. Roberts and Robert Gunning are parties of the second part and a group of other stockholders are parties of the first part. It is further provided in the contract that each of the parties will pay their proportion of the expenses and costs of suits, litigation and other charges. Robert Gunning at the time the contract was made was a director and vice president of the company and Joseph C. Roberts had recently resigned as a director. The so-called "conspiracy stockholders" had acquired their stock in the company, or a large portion thereof, under a contract with the Gibson Mining company, substantially like that set out above. Fifteen hundred shares of stock, fully paid-up and non-assessable of the Gibson Mining Company, Limited, of Kaslo, British Columbia, at 20 cents per share, was so certified to be purchased by Joseph C. Roberts on May 25, 1918.

The defendant, Joseph C. Roberts, was the ring-leader in all the operations of the so-called syndicate signing the conspiracy contract, in its operations against the Gibson Mining company. The other stockholders delivered their several contracts to Roberts, who commenced the action in Portland against the company.

Roberts had been advised by the attorney for the Gibson Mining company in British Columbia that the agreement of the Gibson Mining company to refund stock subscriptions to the purchasers, who had become dissatisfied at the expiration of twelve months thereof, was illegal and unenforcible in Canada, but probably valid in Oregon.

That is one reason that the action was commenced at Portland, although the corporation had no assets

there and any judgment acquired would subsequently have to be transferred to British Columbia and a judgment obtained thereon.

The corporation was not doing business in Oregon when the actions were commenced and had no representative in Oregon, but it was so arranged that Robert Gunning, one of the signers of the conspiracy contract, was to be served in Portland as vice president of the company in the office of George Estes, attorney for J. C. Roberts, plaintiff in the action. George Estes was afterwards disbared from practicing in the courts of Oregon.

By an arrangement between Estes, Roberts and Gunning, D. D. Hail, an attorney, was selected to make an appearance for the company. This he did by filing a general demurrer.

It was not alleged in the complaint and did not appear in the record of the case, that the company was doing business in Oregon at that time. Hail was paid in funds contributed by the syndicate. He states that he was made to believe that it was a friendly suit and that the rights of the company were fully protected. After filing the demurrer Hail permitted judgment to be taken by Roberts against the Gibson Mining Company, Ltd., without filing an answer.

At the time Roberts commenced the action in the circuit court for Multnomah county against the Gibson Mining Company, Limited, he also commenced action in the name of Carl R. Jones company, a corporation, against the Gibson Mining Company, Limited, and jurisdiction was acquired by D. D. Hail, making a general appearance, the same as in the Roberts case.

A return of the sheriff was regularly made by a deputy sheriff in good faith of the service of summons

and complaint upon defendant D. K. May. At that time D. K. May was not in the state of Oregon and some one was designated as D. K. May, and the deputy sheriff believed that the person was D. K. May, and so made the service and return. The Carl R. Jones company was permitted to take judgment against the Gibson Mining company for the sum of $2,300.75 as demanded in its complaint.

After acquiring the Oregon judgments, the defendant, Roberts, immediately brought action thereon in British Columbia and also brought action on other notes and obligations of the Gibson Mining company and obtained judgment and levied upon the assets of the Gibson Mining company, under these judgments, upon a writ of execution.

After Roberts had obtained the levy upon the property of the Gibson Mining company in British Columbia a creditor of the Gibson Mining company, Byers-Giegerish Green Company, Limited, filed a petition to have the Gibson Mining company liquidated under the winding-up act of Canada. In support of this petition the manager of the petitioning creditor filed an affidavit, stating that Roberts had seized all of the assets of the Gibson Mining company under writ of execution and had advertised the same for sale and

"The said Roberts was for some considerable time vice-president of the Gibson Mining Company, Limited (non-personal liability), and interested in selling shares in capital stock of the company and otherwise financing the company and from such information as I have been able to gather from persons connected with the company, either as officers or share-holders, or creditors of the company, it appears that the said Roberts, and others associated with him, is endeavoring to get the assets of the company and dispose of them."

Pursuant to the petition an order was made directing that the Gibson Mining company be liquidated under the winding-up act of British Columbia and the liquidator appointed sold the assets, about August, 1922, to Joseph C. Roberts for $76,000; the money for expense of liquidation being furnished by Roberts and other members of the conspiracy syndicate; Roberts buying the property for himself and other members of the conspiracy syndicate. They were allowed to credit the amount of their judgments on the purchase price. No money was paid for the property of the Gibson Mining company. They then caused the Gibson Mining property to be transferred to a company which they organized, called the Day Break Mining company.

The defendant, Roberts, at various times, invited plaintiff Louis Chassy to join with him in the conspiracy contract against the Mays and at various other times attempted to coerce Chassy into joining the conspiracy corporation, but Chassy declined to become such member. Chassy offered to pay off all the debts of the Gibson Mining company, which debts Roberts and his associates were buying up for the purpose of pressing them against the Gibson Mining company and acquiring its property.

There are a large number of stockholders of record other than the plaintiffs herein.

■ The validity of a subscription agreement for capital stock of a corporation is controlled by the laws of the state or county where the corporation is organized: 14 C. J. 511, § 763; *Collins v. Morgan Grain Co.*, 16 Fed. (2d) 253, 255.

The agreement of the Gibson Mining company, dated May 25, 1918, made with various subscribers to its capital stock, whereby the corporation agreed to

repurchase the same at the election of the subscriber, 12 months after date, and pay 8 per cent interest on the refunded subscription, was illegal and unenforcible in Canada, and therefor unenforcible in the United States.

The agreement to refund a part of the capital stock of the corporation to the subscriber, if carried out, results in impairing the capital of the corporation and is unfair to the creditors and other subscribers, and such an agreement is often held to be void, the remainder being held to be valid. Such an agreement is held to be ultra vires as the corporation is not allowed to purchase its own stock: Fletcher, Cyclopedia Corp., Vol. 2, § 606, 1324, § 607, pp. 1331, 1332, 1333; *Fogarty v. Hunter*, 83 Or. 183, p. 203, 204 (162 P. 964).

■ In any event, in the case of such an agreement that the corporation, at the option of the purchaser, takes the shares back and refunds the consideration paid, or repurchases them, the purchaser, in order to put the corporation in default, when it has not repudiated the agreement, must give notice that he exercises the option and tender a redelivery of the stock. The option must be exercised and the tender made within the time fixed by the agreement: 14 C. J., § 858, p. 577; *Tilton v. Sterling Coke Co.*, 28 Utah 173, (77 P. 758, 107 Am. St. Rep. 689).

No attempt was made by the defendants within the time of one year mentioned in the agreement to rescind the contract or to return the stock, or the agreement. No valid tender was made to return the stock and agreement at any time. The defendants not only held on to the stock tenaciously, but have been scheming to the best of their ability to obtain the whole of the mine, which was a valuable one.

As the subscription agreements issued by the Gibson Mining company to refund stock subscriptions paid by the subscribers one year after date, are contrary to public policy and unenforcible in Canada, Roberts, Gunning and others, constituting the syndicate, decided to commence an action on these contracts in Oregon. There was never any valid service of the complaint and summons upon the Gibson Mining company, or upon D. K. May in either of the Multnomah county cases. They employed an attorney to make a general appearance for the sole purpose of making it appear that the circuit court of Multnomah county had jurisdiction over the Gibson Mining company, a foreign corporation, contrary to the real facts in the matter.

■ The same may be said in regard to the defendant, D. K. May. The actions were based on collusion and fraud. There was no bona fide appearance in the action by the Gibson Mining company or by D. K. May. The whole proceedings, of which George Estes appears to have been the leading mind, were nauseating and fraudulent and the judgments were and are void and should be expunged from the record.

■ The judgment secured by Roberts in the circuit court for Multnomah against the Gibson Mining company, in favor of Carl R. Jones company, was obtained by collusion and fraud and was void, having been entered without jurisdiction by the court, but based upon the fraudulent appearance made by the plaintiff therein by their attorney, in behalf of the defendant, at the instigation of J. C. Roberts, who was the real party in interest to all intents and purposes. The court could set aside such judgment at any time when its attention was called thereto, there being no jurisdiction over the defendants, the judgments were not real

and the court could correct its own records and free them from the extraneous fraudulent matter without regard to time.

A court will purge its record of void and fraudulent judgments whenever its attention is called thereto: *Finch v. Pac. Reduction, etc., Co.,* 113 Or. 670, 672, 673 (234 P. 296); *Ladd & Tilton v. Mason et al.,* 10 Or. 308, 312; *Huffman v. Huffman,* 47 Or. 610, 618 (86 P. 593, 114 Am. St. Rep. 943); *Western Pattern Mfg. Co. v. American Metal Shoe Co.,* 175 Wis. 493 (185 N. W. 535, 20 A. L. R. 264).

It is clear that the Gibson Mining company was not doing business in Oregon and that the corporation was not subject to being sued in Oregon. It was not maintaining an office here and had no representative in Oregon. Mr. Gunning paid Mr. Hail $50.00 of the funds of the conspiring syndicate the same date the demurrer was signed, and Mr. Roberts paid the balance of Mr. Hail's fee out of the funds of the same parties.

The appellant contends that the court had no right to set aside the judgment obtained by the Carl R. Jones company against the Gibson Mining company because the Carl R. Jones company was not a party to this suit; however, the lack of jurisdiction over the Gibson Mining company and D. K. May is conclusively established and therefore the judgment of the Carl R. Jones company is not a real judgment, but fraudulent and fictitious and the court, having knowledge of this, could set aside its own judgment of its own motion for lack of jurisdiction to enter the judgment in the first instance.

As said by the court in the above case of *Ladd & Tilton v. Mason et al.,* 10 Or. 308, 312:

"The inherent power of the court to set aside and vacate such an entry, made without jurisdiction, at any time afterwards, whether at the same term it is made, or any subsequent term, seems hardly to admit of a serious doubt. Judgments, decrees or orders made without jurisdiction are not more binding upon the courts that enter them than upon persons sought to be affected by them. Not only may they be vacated to subserve the ends of justice between parties litigant, but it would seem that they might be set aside by the courts upon their own motion, by virtue of their inherent power to correct their own records and free them from extraneous matter."

And in the case of *Western Pattern & Mfg. Co. v. American Metal Shoe Co.,* 175 Wis. 493 (185 N. W. 535, 20 A. L. R. 264), the court said:

"It is firmly established in this jurisdiction that where a motion is made in the same case to set aside a judgment void for want of service upon the defendant, no showing in the nature of a meritorious defense is necessary. The judgment is held absolutely void, and the court should expunge it from the record whenever its attention is called to the fact that jurisdiction of the defendant was not acquired by reason of a lack of service of process upon him (citing authorities) * * *. Such a judgment has always been regarded as a mere nullity. It is not a judgment. It is the mere image of a judgment. Its enforcement constitutes a taking of property without due process of law, and will not be tolerated. It was the duty of the trial court to expunge the judgment from the record."

The defendant maintains that, conceding the Oregon judgment to have been fraudulent, void and collusive, that by bringing suit against the Gibson Mining company in British Columbia and obtaining a default judgment, the judgment became *res adjudicata* as to the plaintiffs, and that they are not now in a position

to set aside the Oregon judgment for fraud and collusion, by reason of the second judgment, and by the further reason that the second judgment, when obtained, was filed with the liquidator by Roberts and paid.

The question of *res adjudicata* is answered by the general rule that a judgment, based on fraud and collusion against a corporation, is not binding on the stockholders. In addition to this the stockholders may obtain relief from judgments against a corporation without setting aside a fraudulent judgment. The fact that there were no officers of the Gibson Mining company functioning at the time the Roberts judgments were obtained against the company, is additional reason why the same are not binding upon the nonconsenting stockholders. That stockholders may be given relief without setting aside the judgment and that judgments against a corporation are not *res adjudicata* as to stockholders, are shown by the following authorities: *Robinson v. Phegley,* 84 Or. 124, 131 (163 P. 1166); *Lasalle v. Thistle Gold Mining Co. and Adam Hannah,* 11 B. C. 466; *Saylor v. Commonwealth Banking Co.,* 38 Or. 204, 209 (62 P. 652, 654).

In *Robinson v. Phegley,* 84 Or. at p. 131, the court said:

"Furthermore, the great weight of authority sustains plaintiff's contention that a stockholder in a corporation when confronted with a judgment against the corporation may defeat its force and effect by showing that it was fraudulently and collusively secured. The authorities hold that this contention may be asserted by a stockholder without obtaining a decree setting aside such fraudulent judgment."

The proceedings in the Supreme Court of British Columbia, under the winding-up act, are not *res adjudicata* of the matters and things herein litigated.

In *Lasalle v. Thistle Gold Mining Co. and Adam Hannah*, 11 B. C. 466, the circumstances were somewhat similar to the case at bar. In that case, Hannah, a Minneapolis banker, proposed to buy up all the claims against the corporation known as the Sutherland Mining company, owning property in British Columbia, and sell the corporation's property at sheriff's sale. His principal object, it appearing, was to get rid of Sutherland, the president of the company. The manager of the company was promised an interest in the assets for his cooperation with Hannah in collusively securing the the assets of the company and advancing the interests of one set of stockholders at the expense of another set. The court held the proceeding was collusive and illegal. See also, same case, 37 Sup. Ct. of Canada Rep. 324.

The effect of defendant's contention is that taking this second judgment in Canada in the suit brought on the illegal Oregon judgments, serving papers on the secretary of the company, purged the first ones of fraud and made their subsequent collusive actions legal. They were still carrying out their original collusive and fraudulent schemes and obtaining the judgment in British Columbia on the collusive and fraudulent Oregon judgments was but another step in their unlawful scheme to acquire the assets of the corporation. The default judgment in British Columbia did not make their action any the less collusive, or any the less fraudulent. They had the assets of the corporation sold at sheriff's sale in violation of the rights of innocent stockholders.

We mention the judgment in the Supreme Court of British Columbia for the purpose of showing that the matter of setting aside the fraudulent Oregon judgments is a matter of importance.

We have carefully read all of the testimony, which plainly shows that it was never intended by Roberts and his associates that any opportunity for a defense should be given, or that any defense should be made in either of the cases in the circuit court for Multnomah county, or in the actions upon the Oregon judgments in the Supreme Court of British Columbia.

About the time the action was commenced in the Supreme Court of British Columbia on the Oregon judgments, and when D. K. May and Mrs. May were preparing to go to Kaslo, British Columbia, in the interest of the mining company, at the instigation of Roberts, as the testimony indicates, they were placed under arrest at Spokane, Washington, and detained for about six days, and thus prevented from having an opportunity of making a defense in British Columbia in the action on the Oregon judgments.

The questions involved in this case have never before been presented to any other court based upon pleadings of any kind and, therefore, they have never been passed upon by any other court so as to become *res adjudicata.*

In *Reed v. Hollister,* 106 Or. at page 415 (212 P. 367), the court says:

"It is elementary law that a judgment must be responsive to the issues tendered by the pleadings and that a court has no authority to render a judgment upon issues not presented for determination."

The effect of a foreign judgment in Oregon is indicated in section 763 of Oregon Laws, subd. 2, as follows:

"In case of a judgment, decree, or order against a person, the same creates a disputable presumption of a right as between the parties and their representa-

tives and successors in interest by title subsequent, and can only be overcome by evidence of a want of jurisdiction, want of notice to the party, collusion, fraud, or clear mistake of law or fact.''

In the case at bar, in connection with the Oregon judgments sued on in Canada, we have all of the elements above indicated. (1) Want of notice. Although summons in British Columbia were served on the paper secretary the officers of the corporation were not functioning and there was no one to protect the stockholders from Roberts' suit. (2) Collusion and fraud. The collusion and fraud of the conspirators is clearly established even by their own evidence. (3) Clear mistake of law and fact. It was made to appear by Roberts in the British Columbia suit on the Oregon judgment that the Oregon judgment was regularly, duly and validly given and entered. This was a clear mistake of both law and fact.

The proceedings in British Columbia, including the default judgment and the duplication of claims before the liquidator were all tainted with extrinsic fraud and were not conclusive on the plaintiffs and other stockholders and would not be conclusive even on the corporation, the Gibson Mining company. There was extrinsic fraud in all of Roberts' proceedings in British Columbia as well as in Oregon.

It seems a default judgment in British Columbia is not given as much force and effect as a judgment pronounced after investigation and trial.

In *Harper v. Cameron,* 2 B. C. 365, at page 383, the court says:

''A man can only be estopped in any legal proceeding which has become a matter of record when the subject-matter has been thoroughly and properly sifted

and tried between competent parties, without fraud or surprise or other circumstance which prevents the decision being a complete settlement of the matter in dispute, and of every point which belonged to that subject calling for judicial determination. *Henderson v. Henderson,* 3 Hare 115, and cases there cited. In the present case the judgment set up as an estoppel, and now sought to be set aside, was a judgment by default for want of appearance, in short a judgment ex parte. It could not, therefore, pretend to be a judgment on the merits and therefore could not work as an estoppel."

The liquidation proceedings in Canada under the Winding Up Act, were proceedings in *rem* and were concerned only with the sale of the property of the corporation and disposition of the proceeds among the creditors. The Oregon judgments were not attacked or opened up. In those proceedings the officers evidently felt that they should give full faith and credit to the Oregon judgments as long as they remain unimpeached in Oregon. Mrs. May states that she was told by the court there, in substance, to have the Oregon judgments set aside in Oregon and then to ask for relief in British Columbia.

▬▬▬ The defendants contend that there were laches upon the part of plaintiff, which preclude them from maintaining this suit. Mere delay of itself is not laches, but delay that has worked to the injury of another. The co-conspirators in this case still have the property which they acquired, that is, they incorporated the Day Break Mining company in accordance with the original conspiracy contract and hold the property under that name. No injury appears to have been done to the co-conspiracy by the delay in commencing this suit. The defendants should not be allowed to keep the property exclusively to them-

selves that belongs to all of the stockholders and which the defendants acquired only by collusion and fraud. This suit was brought within the period of the statute of limitations: Or. L., § 6; *Wills v. Nehalem Coal Co.,* 52 Or. 70, 90 (96 P. 528); *Wilson v. Wilson,* 41 Or. 459, 463, 464 (69 P. 923); *Smith's Estate,* 43 Or. 595, 610, 611 (73 P. 336, 75 P. 133); *Baillie v. Columbia Gold Mining Co.,* 86 Or. 1, 23 (166 P. 965; 167 P. 1167).

The defendants contend that valuable evidence in support of their case was lost by the death of Robert Gunning, the vice president and one of the directors of the Gibson Mining company; that if he were alive he would testify in his own good faith in the proceedings in acquiring the Oregon judgments and employing Hail to file an appearance in the cases. The fraud and collusion of defendant and associates, in connection with the Oregon judgments, is conclusively established by their own evidence. The testimony of Robert Gunning would not be of any avail to them: *Sedlak v. Sedlak,* 14 Or. 540 (13 P. 452).

On January 7, 1919, the defendant Roberts wrote to Mr. Chassy as follows:

"I will not reply to White's letter unless we decide to do so after we see a chance to do away with May's control at the same time and not be held up by him * * *.

"About seventeen of us held a meeting Tuesday night and will hold another tomorrow night (Friday). I can not go into the details regarding our plans by mail and am sure it would be much to your interest to come down and enter into our plans for handling Mr. May. The property is too good and it means too much to all of us not to act quickly and do all we can without any neglect."

On July 26, 1919, Roberts wrote to Chassy as follows:

"May is in a tight box and it is fitting closer to him every day he delays putting forth every effort to do the right thing and do it very quickly. It will not do to threaten him and his wife with criminal prosecution by any of the principals involved in the case. That can only be done in a way that will not seem as offered as relief for a settlement. * * * The best thing that can happen just now is to get this judgment of Mr. Howard's fastened on to the Mays. This Seward note for $10,000, as well as all other Portland notes, have been assigned to me to be handled in the interest of all of us as a unit and we consider you in on it to do all together what we can to adjust matters to get justice for us all and eliminate the May management and get work started again at the mine. * * *"

In addition to the fraudulent acts of the defendant and his associates, which were a fraud upon the jurisdiction of the court, and fraudulent as to the defendants in the Oregon cases, there was no cause of action as set forth in the complaint existing in favor of Joseph C. Roberts, or any of his associates named in the complaint against either of the defendants therein.

Joseph C. Roberts and his assignors, named in the complaint, in the case of *Joseph C. Roberts v. Gibson Mining Co., Limited,* in the circuit court for Multnomah county, were at the time of instituting the action and thereafter, stockholders in the Gibson Mining company and not creditors thereof, as alleged in Roberts' complaint.

The plaintiffs were legal and equitable owners of stock in the Gibson Mining Company, Limited, before the institution of the proceeding in the Supreme Court of British Columbia, under the Winding-Up Act, against said company and, except for said proceedings, are now legal and equitable owners of stock therein.

The court can not give complete relief in this suit against the Day Break Mining company, or the members of the Portland and Spokane syndicate agreements, or the trustees thereunder, who are not before this court.

The main contention, upon the part of defendant, is that the plaintiffs, D. K. May and Minnie M. May, were guilty of fraud in that Mrs. May represented to the investors in the mining company that the title to the Gibson Mining claims was clear, and also as to the amount of the money they had invested therein. It appears that one Wolbert claimed an interest in two or three of the mining claims, of which there were seven, and was afterwards decreed to have a one-third interest therein, which Roberts and his associates purchased for $1,000. It appears for some time Roberts assisted in the promotion of the mining property; that he knew about the Wolbert claim but did not believe that it was valid or equitable. The testimony does not support a finding that the representations made by Mrs. May were knowingly false or fraudulent. At that time the seven mining claims had not been crown-granted (or as we would say in the United States, patented). They were mining *claims*. Every one interested knew the title had not been perfected in the mining company.

In equity and good conscience the Mays should not lose all of their rights in the mines on account of such a claimed defect in the title. The title in fee was not claimed to be in the Mays or in the Gibson Mining company. The equities are with the plaintiffs.

The decree of the circuit court should be affirmed. It is so ordered.

BELT and BROWN, JJ., absent.

ROSSMAN, J., dissents.