Argued February 23; affirmed April 12; rehearing denied
July 12, 1932

# STEELE ET AL. *v.* BANK OF CALIFORNIA
# NATIONAL ASS'N

(9 P. (2d) 1053)

*Robert G. Smith* and *E. R. Harvey,* both of Portland (Manning & Harvey of Portland, on the brief), for appellants.

*Thos. G. Greene,* of Portland, for respondent.

RAND, J.  On December 2, 1926, plaintiffs deposited with the Bank of Kenton a cashier's check for $6,000 payable to their order and drawn by the Citizens' Bank of Portland, which they had indorsed "Pay to the Bank of Kenton," and were given immediate credit upon their pass-book and the books of the bank for that amount.  On the afternoon of the same day the Bank of Kenton indorsed the check "Pay to the order of the Bank of California" and deposited it with defendant, together with other items amounting in all to the sum of $69,843.96, and was at once credited with said aggregate amount upon its account with defendant.  On the same day and before the close of business, defendant paid checks and drafts drawn against said account by the Bank of Kenton in excess of the amount of its deposit so that at the close of business on that day the Bank of Kenton had overdrawn its account in the sum of $3,106.  At the time of these transactions the Bank of Kenton was insolvent but it was a going concern and did not close its doors until the next morning, when it was taken over by the state superintendent of banks for the purpose of liquidation.  Upon learning of its suspension, plaintiffs stopped payment of the check and later this defendant sued the drawer and recovered judgment for the amount of the check.

Plaintiffs brought this action to recover the moneys thus collected with legal interest on the ground that the defendant, when it obtained the check, knew that the Bank of Kenton was insolvent.

Defendant is a banking corporation doing business at Portland and was one of the reserve depositories of the Bank of Kenton, where most of that bank's reserves were kept. It was the habitual practice of the Bank of Kenton to deposit daily with defendant checks, drafts and other cash items received over its own counters and to draw checks and drafts against said account in settlement of its obligations. As so conducted, the business between the two banks averaged about thirty million dollars a year.

Upon the trial of the cause and after the close of plaintiffs' testimony, the court granted defendant's motion for nonsuit and dismissed the action.

■ Plaintiffs assign errer in the granting of the motion and also in the court's refusal to receive in evidence a written agreement entered into by the Bank of Kenton with defendant on October 31, 1919, wherein it was agreed that, in consideration of defendant's loaning moneys to the Bank of Kenton, it should deposit with defendant collateral security. The evidence offered and received shows that the amount of such loans was $94,000 and the amount of the collateral deposit $140,000. In *Bank of California v. Portland Hide and Wool Company,* 131 Or. 123 (282 P. 99), this particular contract was introduced in evidence, and evidence was first received and then stricken from the record, showing the amount of loans made under the contract and the amount of collateral deposited, and that after the loans had been paid by the application of the collateral a surplus of $24,837.49 remained on hand. In that case, this defendant had brought an action to recover from the drawer the amount of a draft that the drawer had deposited with the Bank of Kenton from which this defendant had purchased it. This defendant recovered judgment in the action and the striking of the testi-

mony was assigned as error. Upon the appeal therefrom, it was held that, since the defendant in that action was a principal debtor and the deposit belonged to the Bank of Kenton, the defendant was not entitled to have the same applied in payment of the draft and, therefore, it was wholly immaterial whether any surplus remained in the hands of this defendant, the plaintiff in the action, since it would not operate in any event to discharge the drawer's liability. The rules stated by the court in that case apply to and are controlling on the question presented here. It is clear that the surplus remaining in the hands of this defendant after the payment of its claims were assets of the insolvent bank and passed to the superintendent of banks when the Bank of Kenton closed its doors, and that these plaintiffs had no interest therein or right to have the same applied in discharge of their obligations. The proof offered, therefore, was inadmissible.

■ Plaintiffs contend that there was evidence to go to the jury upon the question of whether this defendant was a holder in due course; therefore, that the granting of a nonsuit was error. The complaint upon which the case was tried alleged the defendant knew the Bank of Kenton was insolvent at the time it obtained the draft. There was no evidence offered which tended in any way to support that allegation. After the motion for nonsuit had been made, plaintiffs were permitted, over defendant's objection, to amend their complaint so as to allege, in place of actual knowledge as first charged, that, because of certain alleged facts, the defendant took the draft in bad faith. The evidence offered by plaintiffs shows that the Bank of Kenton was insolvent but that the fact of its insolvency had been concealed by false and fraudulent entries upon its books which were not discovered by anyone until several months

after the bank was closed. The evidence further shows that in March, 1926, the superintendent of banks made an examination of the books and records of the Bank of Kenton and reported that the bank was solvent and that subsequent examinations made by him of the bank's affairs did not show its insolvency; that the reason therefor was the false entries which had been made upon the books and which were not discovered until several months after the bank had been closed. The evidence further shows that the Bank of Kenton, an outlying bank in the city of Portland, was doing business in the vicinity of the stockyards and that much of that business was transacted through it; that it had deposits running from $650,000 to $1,000,000 which varied from day to day because of the business transacted in the stockyards. The evidence further shows that at times the Bank of Kenton had overdrawn its account with defendant in small amounts which were always paid by deposit made on the following day; that because of these overdrafts, defendant complained to the officers of the Bank of Kenton; that they had promised that the bank would make no further overdrafts. It appears from the testimony that the reason for the bank's closing at the time it did was that the Bank of Kenton had drawn a check against its account with defendant for the sum of $57,000 and had no money in its account to pay the same and that about 4 o'clock on the afternoon of December 2, 1926, one of defendant's officers called up the Bank of Kenton and informed its officers that it would not loan any more money to the Bank of Kenton and that unless it deposited on that day checks or drafts to cover the amount of the check it would return the check; that that evening at a meeting of the clearing-house board, the Bank of Kenton applied for a loan of $200,000 from

the clearing-house banks, and stated that if it could not obtain that loan it would have to close its doors, and that the loan was not made. This all occurred after defendant had obtained the check in question and paid out all the moneys it had on deposit to the credit of the Bank of Kenton and the amount of the overdraft referred to, and is wholly insufficient to show that the defendant took the check in bad faith. In fact, the whole dealings between the two banks, as shown by plaintiffs' evidence, refutes the contention that this defendant had any reason to believe, up to the time the Bank of Kenton closed its business on the evening of December 2, 1926, that it was insolvent.

When paper is indorsed without restriction by a depositor and is at once placed to his credit by the bank to which he delivers it, he becomes the creditor of the bank and the bank becomes the owner of the paper and, in making the collection, the bank is not the agent of the depositor: *Bank of California v. Young*, 123 Or. 95 (260 P. 227). When plaintiffs delivered the check in question to the Bank of Kenton with their indorsement thereon, ''Pay to the Bank of Kenton,'' and were credited with the amount of the check as cash and not as paper, the bank became the owner of the paper and the debtor of plaintiffs for the amount credited. The transaction was not one in which the relation of principal and agent could arise. If plaintiffs had wished to retain their ownership of the paper, they could have done so by indorsing the check ''For collection.'' Instead of doing so, their indorsement was unrestricted and the title to the paper passed to the Bank of Kenton when they delivered it to that bank and received credit for the amount of the check.

■ As stated, plaintiffs first alleged that the defendant received the check knowing at the time the Bank of Kenton was insolvent. The case was tried on the issue made by a denial of that allegation. Subsequently and after the motion for nonsuit had been made, and without taking any additional testimony, the complaint was amended so as to allege that the defendant acquired the check in bad faith. Under the Negotiable Instrument Act, section 57-406, Oregon Code 1930, for plaintiffs to prevail under their theory of the case, it was necessary for them to show either that defendant, when it took the check, had actual knowledge of some infirmity in the instrument or defect in the title or else to show that it had knowledge of such facts that its action in taking the check amounted to bad faith upon its part. We can find no evidence in the record to sustain either charge. The check was a negotiable instrument, regular on its face, and it had been indorsed without restriction by the payee. If the Bank of Kenton, in accepting the check and placing it to the credit of plaintiffs, was not the equitable owner of the check as contended for by plaintiffs, it was the legal owner and its unrestricted indorsement clothed that bank with the indicia of ownership and, when it passed into the hands of a subsequent holder in due course, plaintiffs, if they were the equitable owners of the check as contended for, are not entitled to follow the proceeds of the check into the hands of this defendant who acquired it in good faith for value and without notice. The burden of proving its case was on the plaintiffs and there was no testimony offered by plaintiffs which shifted that burden. The case, therefore, came within the provisions of section 57-407, Oregon Code 1930, which provides: "A holder in due course holds the instrument free from any defect of title of prior

parties, and free from defenses available to prior parties among themselves, and may enforce payment of the instrument for the full amount thereof against all parties liable thereon.''

■ Thus far we have considered the case upon plaintiffs' theory that the title to the check never passed to the Bank of Kenton. It is admitted that this deposit to the account of plaintiffs in the Bank of Kenton was a general deposit. Had it been a special deposit or had it been deposited for a specifically designated purpose, the title to the check would not have passed to the Bank of Kenton. Plaintiffs assume that the mere insolvency of the Bank of Kenton was sufficient to prevent the title from passing. This is not the law.

The only evidence offered by plaintiffs upon the question of whether the bank was hopelessly insolvent was that of Mr. Thatcher, who was the cashier of the bank at the time it failed. In his testimony, Mr. Thatcher said that he discussed the matter of the bank's insolvency with Mr. Burke, who was in the active management of the bank. His testimony was as follows: ''Q. What did he say about it? A. Well, he said to fight along. I tried to quit a couple of times. He told me if I would quit he would have to close it up, * * * Q. I didn't get just what Mr. Burke said. What was it, Mr. Thatcher, when you discussed this insolvency with him? A. Well, we talked together about it. I told him I would like to get out of there; I could not stand it; and he said, well, we would have to fight it along, make the best of it. He said, 'I will pull it out one of these days.' Q. You wanted to get out of the bank, and that is what you were talking to Burke about? A. Well, I was vitally interested in the bank, of course. I owned stock in the bank myself. Q. And Burke says, 'Fight along?' A. Yes, sir.

Q. Did Burke express the idea that he could pull through if you kept the fight up long enough? A. Well, he did, yes. Q. Burke thought and so expressed himself to you that if they could pull along there and keep the bank open and collect some of these big overdrafts that you speak about, why, they would be all right and they could go on in business, didn't he? A. Well, he didn't expect to collect some of the overdrafts that he knew were bad; he expected to get some money himself, I believe, and put in there. Q. He had reasonable expectations of getting some money himself to put in the bank? A. Yes, sir.''

From this testimony it is apparent that the officers of the bank expected eventually, by continuing in business, that the bank could be made solvent. As was said by Mr. Chief Justice Rugg in *Steele v. Allen,* 240 Mass. 394 (134 N. E. 401, 20 A. L. R. 1203); ''Acceptance of deposits by a bank is a representation of solvency. A bank hopelessly insolvent, receiving deposits from those who confide in its good reputation or in its representations, is held to knowledge that it cannot meet its obligations. Taking deposits under such circumstances is the equivalent of a preconceived purpose not to pay, and is a fraudulent act. The contract of deposit may be rescinded by the depositor and the deposit, or its proceeds, if traced, may be recovered in like manner as other trust funds. On the other hand, simple insolvency, even of a bank, does not warrant the rescission of deposits if there are genuine and reasonable hope, expectation, and intention on the part of the officers of the bank to carry on its business and to recover sound financial standing. There must be the further fact that it is reasonably apparent to its officers that the concern will presently be unable to meet its obligations as they are likely to mature, and

will be obliged to suspend its ordinary operation. The facts must establish the conclusion that the trust company accepted the deposit knowing, through its officers, that it would not and could not pay the money when demanded by the depositor.'' See also *Washington Shoe Mfg. Co. v. Duke,* 126 Wash. 510 (218 P. 232), and note to the case of *Steele v. Allen,* 20 A. L. R. 1206.

It is not necessary for us to decide whether the condition of the Bank of Kenton, when receiving the deposit of plaintiffs, was such that that bank became a trustee *ex maleficio* for plaintiffs of the money. Upon that question we offer no opinion for the whole evidence shows that defendant was a holder in due course and took the instrument free from any defect of title of prior parties, if any such existed.

Judgment affirmed.

BEAN, C. J., ROSSMAN and KELLY, JJ., concur.