Argued April 6; reversed May 18, 1943

# AMERICAN SURETY CO. OF NEW YORK *v.* MULTNOMAH COUNTY

# AMERICAN SURETY CO. OF NEW YORK *v.* CITY OF PORTLAND

(138 P. (2d) 597)

Before Bailey, Chief Justice, and Belt, Rossman, Kelly, Lusk, Brand and Hay, Associate Justices.

*Nicholas Jaureguy,* of Portland (Stott & Gooding, Cake, Jaureguy & Tooze, and Herbert C. Hardy, all of Portland, on the brief) for appellant.

*Frank S. Sever,* Deputy District Attorney, of Portland (James R. Bain, District Attorney, of Portland, on the brief) for respondent Multnomah County.

*L. E. Latourette,* City Attorney, of Portland (Alexander G. Brown, Deputy City Attorney, of Portland, on the brief) for respondent City of Portland.

The plaintiff brings two separate actions, the first against Multnomah County and the second against the City of Portland, a municipal corporation. The two

cases have been consolidated for the purposes of briefs and arguments, and we will dispose of them in a single opinion, noting in the course thereof such distinctions between them as may appear to be material.

■ Demurrers to the amended complaints in both cases were sustained by the trial court. The plaintiff refused to plead further, the complaints were dismissed and the plaintiff appeals. For the purposes of this opinion on demurrer we shall treat the allegations in the complaint as true without constant reiteration that "plaintiff alleges  *  *  *."

The cases grow out of defalcations of D. G. Drager, treasurer of Marion County, Oregon, who misappropriated funds of that county and applied them to the payment of his personal tax obligations to Multnomah County, and in the second case to assessments due from him to the City of Portland. In the first case (against Multnomah County) twelve, and in the second case (against the City of Portland) thirty, causes of action are separately stated. From the first cause of action in the case against Multnomah County, it appears that D. G. Drager was the treasurer of Marion County and that the plaintiff was surety on his official bond. The defendant, Multnomah County, "had and received to the use of said Marion County Oregon, the sum of $59.31,  *  *  * as hereinafter set forth." D. G. Drager was individually the sole legal, beneficial and record owner of real property in Multnomah County with which Marion County had no connection. Marion County had on deposit in a Salem bank certain county funds belonging to said county and held by said bank to the credit of Marion County. Drager in his capacity as county treasurer of Marion County drew a check upon said bank account of Marion County, payable to

the tax collector of Multnomah County, which check was received from Drager by the defendant Multnomah County through its sheriff and tax collector. Defendant Multnomah County cashed the check and received the proceeds. The check was upon the form used by Marion County in the disbursement of county funds and was signed by "D. G. Drager, County Treasurer". The check was in payment of Drager's taxes on Drager's land in Multnomah County. Marion County had no obligation with respect to the payment of the taxes, nor any benefits to be derived from such payment.

Since special questions are raised concerning the form of the allegations in Paragraph XII of the complaint, we quote it in full.

"Said T. M. Hulburt, Sheriff and Tax Collector of Multnomah County, Oregon, by the records of his office, had notice and actual knowledge that said real property upon which said taxes were paid, was owned by said D. G. Drager, and had notice and knowledge that said Marion County, Oregon, had no interest in any of said real property; and that by the form of said check said tax collector of defendant had notice and actual knowledge that by said payments the funds of Marion County, Oregon, were being used for the personal use and benefit of said D. G. Drager and were not being used for the use or benefit of said Marion County, Oregon, or for the payment of any lawful obligations of Marion County, Oregon, and said Marion County had never authorized said D. G. Drager to make said payment."

The plaintiff surety company, in fulfillment of its obligation on the fidelity bond of Drager, made good the loss to Marion County and claims the right, by subrogation, to maintain this action against the defendant Multnomah County for wrongfully receiving

and retaining corporate funds of Marion County, Oregon. Marion County has assigned to the plaintiff all its rights against the defendant arising from the said transaction. Plaintiff has demanded and defendant has refused payment, and plaintiff prays for judgment. The amounts and dates in the remaining eleven causes of action against the defendant Multnomah County vary, but in other respects they present the identical issues which are raised in the first cause of action.

In the second case the complaint proceeds upon the same theory and largely upon identical allegations directed against the City of Portland on account of misappropriation by Drager of Marion County funds which he applied in the identical manner to the payment of certain liens or assessments on his real property in the city of Portland.

In the case against Multnomah County, the defendant demurred on three grounds: (1) failure to state a cause of action, (2) defect of parties defendant, (3) "That as to causes of action Nos. I to X, inclusive, it affirmatively appears from the face of said amended complaint that this action was not commenced within the time limited by Section 1-204, Oregon Code, 1930."

The transactions set forth in the first ten causes of action (referred to in Paragraph III of the demurrer) occurred on or prior to May 4th, 1932. The remaining two causes of action are based on transactions on or subsequent to November 6th, 1935.

In the case against the City of Portland, the defendant demurred on two grounds only: (1) the failure to state a cause of action, and (2) "That as to causes of action numbered I to VIII, inclusive, it affirmatively appears from the face of said amended complaint that this action was not commenced within the time limited

by Section 1-204, Oregon Code 1930.'' In the first eight causes of action referred to in Paragraph II of the city's demurrer, the transactions upon which the causes of action are based occurred on or prior to July 18th, 1932, while the transactions upon which the remaining twenty-two causes of action are based occurred on or after November 6th, 1932.

On the 15th day of May, 1939, the plaintiff paid to Marion County the losses suffered by reason of the defalcations of Drager in all causes of action in both cases, and the complaints against the defendants Multnomah County and City of Portland, respectively, were filed on the 23rd day of February, 1940, and served on the day following.

BRAND, J. Consideration will first be given to the general demurrers filed by both defendants. Unless otherwise noted, the discussion will be directed to the complaint in the case against Multnomah County.

The first and fundamental question of law for our decision may be stated thus: Public funds, the property of a county, are placed on deposit to its credit in a bank, the county treasurer draws a check against the fund, the signature thereon is followed by the words ''County Treasurer'', the check is delivered to the payee named therein in payment of a claim which the payee has against the drawer as a private individual, the payee knows that the money is to be applied on the personal obligation of the drawer, he receives it, so applies it and retains it; what, then, are the rights of the county against the payee?

Prior to the enactment of the Uniform Negotiable Instruments Law, O. C. L. A., Title 69, in the year 1899, what has been called by the defendants the equity doc-

trine was the established rule in this jurisdiction and represented the weight of authority elsewhere. In a case which arose before but was decided after 1899, this court said:

"* * * we find the great weight of authority, as well as the better reasoning, supports the rule that the word 'trustee', added to a payee's name in a written instrument, is sufficient to put the purchaser upon inquiry as to all the terms and conditions under which it may have been executed, and in the absence of such inquiry knowledge thereof will be presumed." *McLeod v. Despain,* 49 Or. 536, at p. 549, 90 Pac. 492, 92 Pac. 1088, 19 L. R. A. (N. S.) 276, 124 Am. St. Rep. 1066 (1907).

In *Heitkemper v. Schmeer,* the question was whether a deed in which the grantor's signature was followed by the word "trustee" imputed notice of the trust to the grantee. The court quoted with approval the following:

"The general rule that pervades the whole doctrine of notice is that, whenever sufficient facts exist to put a person of common prudence upon inquiry, he is charged with constructive notice of everything to which that inquiry, if prosecuted with proper diligence, would have led." *Heitkemper v. Schmeer,* 130 Or. 644, at p. 665, 275 Pac. 55, 281 Pac. 169 (1929).

The holding of these cases is not questioned, and they correctly state the law of this state as of the dates of the decisions. See also authorities cited with approval in *Cole v. Canadian Bank of Commerce,* 115 Or. 456, at p. 463, 239 Pac. 98 (1925).

In *Hill v. Flemming,* 128 Ky. 201, 107 S. W. 764, 16 Ann. Cas. 840 (1908), one Northcutt drew a check on his official fund in payment of his individual indebtedness, signing it "I. B. Northcutt, Deputy Sheriff". The court

rejected the contention that the words "Deputy Sheriff" were merely descriptio personae, (see *McLeod v. Despain,* supra, to the same effect) and said:

> "In the case at bar the check itself gave ap-appellant notice of Northcutt's official position. In [it] further notified him that the funds upon which the check was drawn were deposited to his credit as deputy sheriff. We therefore think it was his duty to make inquiry for the purpose of ascertaining whether or not the funds transferred by the check belonged to Northcutt individually, or to the state and county. Failing to do this, he received the amount of the check impressed with the trust in favor of the state and county." *Hill v. Flemming* supra, 107 S. W. at p. 766.

The defendants seek to distinguish *Hill v. Flemming* upon the ground that it follows the strict equity doctrine applicable to trustees as set forth in *McLeod v. Despain.* They recognize that under the equity rule the word "trustee" after a signature is sufficient to put the party dealing with the trustee upon inquiry. The defendants, however, contend that the equity rule does not apply in the case at bar by reason of the provisions of the Negotiable Instruments Law (O. C. L. A. 69-406) which are as follows:

> "To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

Defendants rely strongly upon *Bank of California National Ass'n v. Portland Hide & Wool Co.,* 131 Or. 123, 282 Pac. 99 (1929), in which the court applied the provisions of the foregoing statute and observed that

"The strictness of the general equity doctrine of constructive notice is not applied to a purchaser for value of negotiable instruments before maturity."

In that case the plaintiff was found to be a purchaser for value without notice, of a draft fair upon its face. The action was against the drawer of a negotiable sight draft payable to the order of the Bank of Kenton. The defense was that the title of the payee Bank of Kenton was defective, it having taken the draft while insolvent. No fiduciary relationship was involved, and there was nothing in the instrument to disclose any infirmity therein. It was very properly held that the plaintiff should not be charged with notice of the defect in the title unless it had actual knowledge or knowledge of facts such that its action in taking the instrument would amount to bad faith.

It remains to be determined whether the provisions of O. C. L. A. 69-406, supra, have changed the equity rule which imposes the duty of inquiry upon one who receives a check which upon its face appears to be drawn upon trust funds and which is tendered to the payee in payment of the personal obligation of the apparent trustee. The matter received attention in this court in a considered dictum in the case of *New Amsterdam Casualty Co. v. Robertson and The West Coast National Bank,* 129 Or. 663, 278 Pac. 963, 64 A. L. R. 1396 (1929). The Negotiable Instruments Law was in effect at the time of the transaction involved. This was an action of conversion against the defendant bank. Robertson was clerk of a school district and maintained an account with the defendant bank in the name of "School District No. 106, Russell W. Robertson, Clerk." Robertson issued checks on the school district account

and deposited them to his personal account in the defendant bank and embezzled the funds. The plaintiff as surety on the bond of the school clerk paid the loss to the school district and sought to be subrogated to the rights of the school district against the bank on the theory that the bank participated in the breach of the trust. It was stipulated that

> "* * * at no time until after the transactions mentioned in the complaint did the bank have any knowledge that funds were being misappropriated by Robertson * * * unless such knowledge be inferred from the facts heretofore stated * * * *"

It was further stipulated that the directors of the school district knew that checks were drawn on the school district account and deposited to Robertson's personal account and that no protest was made to the bank. The court held that the form of the checks and the manner in which the account was handled did not constitute notice of a misappropriation and that the finding of the lower court that the bank acted in good faith was tantamount to the verdict of a jury. We refused to hold "as a matter of law that it was obligated to make inquiry." It was therefore held that the bank was not a participant in the misappropriation of the funds and was not liable to the surety. However, we said:

> "It is to be borne in mind that the bank did not profit by reason of the misappropriation of the funds by the clerk. He did not use the money to pay any of his indebtedness to the bank. If such had been done the liability of the bank would clearly have been established: Morse on Banks and Banking (5 ed.), § 317. Having thus been advised of the wrongful application of funds by the fiduciary to his own credit, the bank could subsequently honor

checks at its peril. Cases such as Gerard v. McCormick, 130 N. Y. 261 (29 N. E. 115, 15 L. R. A. 234); Central National Bank v. Connecticut M. L. Co., 104 U. S. 54 (26 L. Ed. 693); Union Stockyards National Bank v. Gillespie, 137 U. S. 411 (34 L. Ed. 724, 11 Sup. Ct. Rep. 118) and Manhattan Web Co. v. Aquidneck Nat. Bank, 133 Fed. 76, wherein the bank accepted trust funds in payment of fiduciary's indebtedness to it, are clearly distinguishable from the one at bar.'' *New Amsterdam Casualty Co. v. Robertson and The West Coast National Bank,* (supra), 129 Or. at p. 669.

The dictum clearly upholds plaintiff's contention in the case at bar.

Before considering the effect of the actual decision in the New Amsterdam case (on which defendants rely) reference will be had to the holding of the Restatement of the Law of Trusts and to certain passages from Scott on Trusts, it being remembered that the author of the latter work was the official reporter of the Restatement of the Law of Trusts. These citations will at once clarify the issues, support the dictum in the New Amsterdam case and distinguish many of the cases cited by the defendants. We will then return to the decisions.

The arrangement employed in the Restatement is important, for it is based upon logical distinctions. In a chapter dealing with liabilities of third persons (Chapter 9) the Restatement deals with liabilities of transferees of trust property (Topic 2) and considers what constitutes notice of breach of trust.

"If the name of the transferor in an instrument evidencing his title to the property is followed by the word 'trustee' or other words indicating that he is or may be a trustee, and the property is

transferred in payment of a personal debt of the trustee to the transferee, or in a transaction known to the transferee to be for the benefit of the transferor personally, the transferee is chargeable with notice that the transfer is in breach of trust.''

''If a negotiable bill of exchange or promissory note is payable or indorsed to a person whose name is followed by the word 'trustee' or other words indicating that he is or may be a trustee, a transferee should make inquiry whether the holder is in fact a trustee and whether and under what circumstances he is empowered to transfer the instrument.'' 2 Restatement of the Law of Trusts, § 297, *m, o,* p. 912.

To the same effect, see 2 Scott on Trusts, §§ 297.5 and 297.6, and cases cited. From the latter authority we quote:

''The principle is likewise applicable when an instrument is drawn by one as fiduciary whether as trustee, executor, administrator, guardian or the like, or by a public official or corporate officer, payable to his private creditor, or by the weight of authority when payable to bearer or to himself personally and delivered in payment of his private debt. The result is the same whenever the circumstances are such as to make it evident that the transaction is for the personal benefit of the fiduciary.'' Scott on Trusts, § 297.6, p. 1644.

■ From the foregoing we deduce a general rule applicable under the negotiable instruments law to the effect that a transferee is chargeable with notice when two circumstances co-exist: first, that the name of the transferor is followed by words disclosing a fiduciary relationship, and, second, that the instrument is transferred in payment of a private debt owed by the transferor to the transferee. Under such conditions, the transaction is prima facie wrongful. 2 Scott on

Trusts, § 297.6, pp. 1643 and 1644. Cases involving facts satisfying the foregoing rule may be characterized as belonging to *class one.*

In what we may call *class two* there appears only the first of the two characteristic features of *class one.* The signature of the transferor is followed by the word "trustee" or the like, but the instrument is not taken in payment of the private obligation of the transferor to the transferee. This situation is considered in Scott on Trusts. We quote:

> "But suppose that the instrument is not used for the purpose of paying a private debt of the fiduciary or in any other transaction known by the transferee to be for the personal benefit of the fiduciary. Is the indorsee or payee under an obligation to ascertain whether the drawer or indorser is committing a breach of his fiduciary obligation?"

    \*        \*        \*        \*        \*

> "Where, however, the fiduciary character of the transferor appears on the face of the instrument, it is held by the weight of authority that the transferee is bound to make inquiry as to the authority of the transferor. It is held that the rule as to what constitutes notice stated in § 56 of the Negotiable Instruments Law that actual knowledge or bad faith is essential to notice is not applicable where the fiduciary character of the transferor appears on the face of the instrument. The transferee is not a holder in due course if the transferor [transferee] does not use due diligence to inquire into the authority of the transferor to negotiate the instrument. As to defenses other than the lack of authority of the transferor to negotiate the instrument due to the fiduciary character in which he holds it, the transferee is a holder in due course unless he had actual knowledge of these defenses or acted in bad faith." 2 Scott on Trusts, § 297.6, p. 1645.

Upon the same point the Restatement reads as follows:

"If the name of the transferor in an instrument evidencing his title to the property transferred is followed by the word 'trustee' or other words indicating that he is or may be a trustee, the transferee should make inquiry whether the transferor is in fact a trustee. Although such words may be used where no trust exists, being employed merely as a description of the person holding title under such instrument, the transferee is not justified in assuming without inquiry that they are so used. If a proper inquiry would give him knowledge or reason to know of the existence of a trust, he is chargeable with notice of the existence of a trust." 2 Restatement of the Law of Trusts, § 297 (d), p. 907.

In situations falling within what we shall call *class three* we find cases in which the general rule applicable in *class two* does not apply. Under Topic 3 of the Restatement, § 324, consideration is given to the rules applicable to the liability of "depositories of trust funds". In dealing with this specific problem the authors take cognizance of the peculiar position and functions of banks as conduits through which negotiable paper flows. We quote the following from the Restatement:

"Thus, if a trustee indorses a check payable to him as trustee and deposits it in a bank to the credit of his personal account, the bank is not bound to make inquiry whether the trustee is committing a breach of trust in making the deposit; and although the trustee in fact commits a breach of trust in making the deposit, the bank is not liable for participation in the breach of trust in the absence of further circumstances known to the bank indicating that the trustee is committing a breach of trust.

"Similarly, if a trustee draws and deposits in a bank to the credit of his personal account a check

drawn by him as trustee upon an account in the same or another bank in his name as trustee, payable to himself personally or to the bank in which he deposits it, the bank of deposit is not bound to make inquiry whether the trustee is committing a breach of trust in making the deposit; and although the trustee in fact commits a breach of trust in making the deposit, the bank is not liable for participation in the breach of trust in the absence of further circumstances known to the bank indicating that the trustee is committing a breach of trust.'' 2 Restatement on the Law of Trusts, § 324 (d), pp. 966 and 967.

''Thus, if a trustee makes a deposit in a bank to his credit as trustee, and a check drawn by the trustee payable to a third person is presented to the bank, the bank is not bound to make inquiry whether the trustee is committing a breach of trust in withdrawing the funds; and although the trustee is in fact committing a breach of trust by making payment to his personal creditor, the bank is not liable for participation in the breach of trust in the absence of further circumstances known to the bank indicating that the trustee is committing a breach of trust.

''Similarly, if a trustee draws a check upon his account as trustee payable to himself personally, the bank is not bound to make inquiry whether the trustee is committing a breach of trust thereby, whether the check is presented by the trustee over the counter for payment or is presented by a third person to whom it has been indorsed by the trustee, or is presented properly indorsed through another bank. Nor is the bank bound to make such inquiry where the trustee deposits the check in the bank to the credit of his personal account with the bank.

''Similarly, if a trustee deposits in a bank to the credit of his personal account a check drawn by him as trustee or payable to and indorsed by him as trustee, and subsequently draws a check upon

his personal account payable to himself personally or to a third person, the bank is not bound to make inquiry whether the trustee is committing a breach of trust thereby, and in honoring the check is not liable for participation in a breach of trust, in the absence of further circumstances known to the bank indicating that the trustee is committing a breach of trust." 2 Restatement of the Law of Trusts, § 324, p. 968.

The reason for the rule is stated in 4 Bogert on Trusts and Trustees, § 908, p. 2632. Referring to the case of a trustee who carries trust funds in his personal bank account, the author says:

"The courts feel that the bank is entitled to believe that the trustee will check the trust credit out of the personal account for trust purposes, and that he is merely guilty of careless or unbusinesslike methods of handling the trust property and not of dishonest practices. It is the judicial opinion also that to require the bank to investigate such a transaction would put a burden on the bank for which it is not paid by the trust, and would clog the handling of commercial paper in a way which would be a disadvantage to the business community."

■ It seems to be the contention of the defendants in the case at bar that it is entirely proper for trustees to keep trust funds in a personal account. This contention receives no support from the Restatement, for it is there said:

"It is the duty of the trustee not to mingle trust funds with his own funds. Thus, it is improper for the trustee to deposit trust money in his individual account in a bank." 1 Restatement on the Law of Trusts, § 179 (b), p. 457.

Such is the rule of both law and morals in this state. Banks may be exonerated when funds known by them

to be trust funds are drawn out of the bank on the personal check of the trustee, not because the conduct of the trustee is proper but because the bank may be entitled to presume that the conduct of the trustee is proper. Although the rule prevailing in what we have called *class three* cases concerning the liability of depositories of trust funds may protect the bank in ordinary commercial banking transactions, it affords no protection to a bank when such an institution is the transferee of a check drawn by a fiduciary as such and tendered in payment of a personal debt of the trustee to the bank. In such cases, the bank is in the same position as any other transferee in *class one* cases.

> "Thus, if the bank accepts in payment of the trustee's personal indebtedness to the bank a check drawn in breach of trust upon the trustee's account as such in the bank, the bank is liable for participation in the breach of trust." 2 Restatement on the Law of Trusts, § 324, p. 969.

These principles will serve to make clear the distinction in a multitude of cases which have been cited by the defendants in the case at bar. The limitations of space permit a discussion of only the more important ones in this opinion.

To return to *New Amsterdam Casualty Co. v. Robertson,* supra, it will be recalled that Robertson issued checks signed in his fiduciary capacity, deposited them to his personal account, withdrew them on his personal check and embezzled the proceeds. There were no circumstances other than the form of the transaction which could charge the bank with knowledge. The case falls within *class three.* It involved the question of liability of a depository of trust funds. The court declined to hold "as a matter of law that the bank was

obligated to make inquiry'', and in accordance with the quotation from Bogert it added,

"To do so would greatly encumber and burden banking institutions in the transaction of legitimate business by over-burdensome restrictions.''

The bank did not take Robertson's check in payment of any obligation to itself, and the actual decision, although good law, affords no comfort to the defendants in the case at bar, while the dictum quoted supra strongly supports the plaintiff. The New Amsterdam case is also distinguishable upon other grounds. The answer of the defendant bank alleged that the school directors held out to the bank that Robertson was authorized to make out checks to his personal account and that they were therefore estopped to assert otherwise. The trial court found accordingly, and this court said:

"Indeed, the long acquiescence and consent of the school district to the method and manner in which the clerk checked on this account would reasonably lead the bank to believe that the clerk was authorized so to act. Since the plaintiff is subrogated to the rights of the school district it is bound by this equitable principle of estoppel.'' *New Amsterdam Casualty Co. v. Robertson,* supra, 129 Or. at p. 674.

In *Fidelity & Deposit Co. of Maryland v. Hamilton National Bank,* 23 Tenn. App. 20, 126 S. W. (2d) 359 (1938), an account was kept in the defendant bank under the name of "O. Mather, Trustee", wherein were deposited funds of the life insurance company of which Mather was treasurer. Mather was indebted to one Wright, and the defendant bank as collecting agent for Wright held Mather's note and collateral securities. Mather drew a check on the trust funds,

signing it "O. Mather, Trustee" and delivered it to the bank in payment of his personal obligation to Wright. The bank accepted the check and returned to Mather his note and collateral. The court held that the use of the word "trustee" was constructive notice to the bank, sufficient to put it on inquiry into the status of the fund against which the check was drawn.

"The defendant Bank cannot escape liability because obligated by the depository contract to honor checks properly drawn in the name of the depositor for two reasons. In the first place, as we have seen, the bank was charged with notice that Mather was acting merely in the capacity of Trustee and that he was not the real party in interest. In applying these funds to the payment of his own personal obligation, a fact known to the Bank, he was not acting for the Bank's real depositor and the Bank breached its implied contract with the true owner of the funds to pay them out only upon checks drawn by such owner or by another duly authorized to act for it and, having knowledge or notice of an unauthorized conversion of the funds by the Trustee, it was the Bank's duty to refuse to honor the check.

"In the second place, when the Bank accepted Mather's check it was not acting in the capacity of a depository of funds but in the capacity of collecting agent for Wright. If the check had been drawn upon another bank by Mather as Trustee the result would not have been different." *Fidelity & Deposit Co. of Maryland v. Hamilton National Bank,* supra, 126 S. W. (2d) at p. 363.

The provisions of the Negotiable Instruments Law, supra, were called to the attention of the court, but it held:

"The defense that the defendants acquired Mather's checks without notice, as defined by Section 56 of the Uniform Negotiable Instruments Act

is the same as that made in Ford v. H. C. Brown & Co., 114 Tenn. 467, 88 S. W. 1036, 1 L. R. A., N. S., 188, cited supra, in which the court held this section of the Act inapplicable. Later cases on this subject include Union Nat. Bank v. Bluff City Bank, 152 Tenn. 486, 279 S. W. 797 and Stansbury v. Bank of Amory, 13 Tenn. App. 673." *Fidelity & Deposit Co. of Maryland v. Hamilton National Bank,* supra, 126 S. W. (2d) at p. 364.

*Ford v. H. C. Brown & Co.,* 114 Tenn. 467, 88 S. W. 1036, 1 L. R. A. (N. S.) 188, while not on all fours with the instant case, is important as to the effect of the Negotiable Instruments Law. The court first took notice of *Unaka Bank v. Butler,* 113 Tenn. 574, 83 S. W. 655, which had established that the former (equity) "rule of constructive or implied notice had been abrogated by the Negotiable Instruments Law." The Unaka Bank case was then distinguished as follows:

"In Unaka Bank v. Butler, supra, the court was dealing with a check which did not carry on its face any notice of defective title, but notice of the infirmity was sought to be fixed by the surrounding facts and circumstances. It will be observed that in the present case each of these certificates of deposit was indorsed by C. N. Woodworth as trustee, and we are of opinion that such an indorsement prima facie and presumptively fixed the purchaser with actual knowledge of want of authority in the trustee to dispose of the paper for his own benefit." *Ford v. H. C. Brown & Co.,* supra, 88 S. W. at p. 1038.

Again, the court said:

"These authorities sustain our position that the word 'trustee' in an indorsement of this character is express notice to a purchaser that there is a cestui que trust or beneficiary, and that his rights may not be sacrificed by the trustee in the sale or

pledge of the note for his own benefit; in other words, our holding distinctly is that such an indorsement is *actual knowledge* to the purchaser of such paper, within the meaning of section 56 of the negotiable instrument law, supra." (Italics ours.) *Ford v. H. C. Brown & Co.,* supra, 88 S. W. at p. 1039.

We think that the court in the Fidelity & Deposit case, supra, somewhat misconstrued the holding in the Ford case. The latter decision did not hold the Negotiable Instruments Law "inapplicable". On the contrary, it held that the holder of a check on which the indorsement contains the word "trustee" after the signature, has "*actual* knowledge" within the meaning of the Negotiable Instruments Law. Both cases, however, are direct authority for the proposition that the recipient of such an instrument is charged with notice of the trust. The one case applies the equity rule and holds the provisions of the Negotiable Instruments Law inapplicable; the other applies the Negotiable Instruments Law and holds that the requirements of that section are satisfied because the form of the indorsement conveyed actual knowledge within the meaning of the act.

The following cases, not cited in the briefs, strongly support the conclusion at which we must arrive. *Bank of Giles County v. Fidelity & Deposit Co. of Maryland,* 84 Fed. (2d) 321 (1936), falls within *class one* and is directly in point. The court quoted with approval from the Restatement of the Law of Trusts, § 324 (h), supra, and said:

"But, if we assume that no one in the banks was aware of the defalcation and that the arrangement between the banks and Walker was made as he testified, the banks are not absolved from liability to the county or its subrogee. When Walker deposited funds to his credit as treasurer of the county, the banks had notice of the nature of the

deposit, and, when they permitted him to pay his personal indebtedness to them by checks upon his fiduciary accounts, they knowingly participated in a breach of trust.'' *Bank of Giles County v. Fidelity & Deposit Co. of Maryland,* supra, at p. 323.

In *Fidelity & Deposit Co. v. Atchison, T. S. F. Ry. Co.,* 147 Kan. 127, 75 Pac. (2d) 283 (1938), a similar rule was applied by the majority of the court in the face of a dissent based on the provisions of the Negotiable Instruments Law (our O. C. L. A. 69-406), and the Restatement of the Law of Trusts was again cited.

The same principles were applied in *Conqueror Trust Co. v. Fidelity & Deposit Co. of Maryland,* 63 Fed. (2d) 833 (1933). The distinction between cases falling within *class one* and the bank cases, *class three,* was made clear. An agent maintained a trust account known to be such by the defendant bank. The court said:

> ''Defendant was entitled to honor Stone's checks drawn to outside parties without investigation either into their purpose or into the state of the account as between Stone and the Association, unless it affirmatively knew that a breach of trust was being committed, but when it received from the commingled account payment of Stone's personal indebtedness it had warning that it might thereby itself be receiving the fruits of a breach of trust, and so it gained no equity superior to that of the association.'' (the surety)

It also said:

> ''It is clearly the law that wherever a depository bank receives funds which it knows or has reason to know are subject either in whole or in part to a trust, in payment of a personal obligation of the trustee to it, it becomes liable in equity to the defrauded cestui. If to its knowledge the funds are subject in their entirety to a trust, the bank is

a guilty party to the misapplication; if to its knowledge they are subject in part to a trust, it acts at its peril." *Conqueror Trust Co. v. Fidelity & Deposit Co. of Maryland,* supra, at p. 839.

The case of *Quanah A. & P. Ry. Co. v. Wichita State Bank and Trust Co.,* 127 Tex. 407, 93 S. W. (2d) 701, 106 A. L. R. 821 (1936), is typical of others which fall within *class three,* supra. A defaulting treasurer received bills of exchange payable to him as treasurer but which belonged to his corporate employer. He indorsed the bills as treasurer, deposited them in a personal account and then withdrew the funds on his personal check and embezzled the proceeds. The court cites with approval the rules laid down in Bogert on Trusts and Trustees, § 908, the restatement of the Law of Trusts, § 324 (d), and the opinion of this court in the New Amsterdam case, all of which authorities we have examined supra. The case involved the peculiar issues incident to the liabilities of depositories of trust funds and was one in which the bank received no personal benefit from the transaction. The authorities cited appear to support the conclusion of the court which was in favor of the defendant bank. While the decision may be correct, that court employed language which is at least misleading and which we think has misled the defendants in the case at bar. The Texas court stated correctly enough the statutory rules of the Negotiable Instruments Law, which is the same as our O. C. L. A., 69-406, supra, and which rule holds in substance that actual knowledge or conduct amounting to bad faith must be shown in order to constitute notice of an infirmity. Thus, the court in the Quanah case appears by implication to suggest that the case of a check drawn or indorsed by a trustee as such gives no more notice or

knowledge of an infirmity than a check fair on its face when the infirmity arises from fraud or the like. If this was the holding of the Texas court, as defendants seemed to think, then we must reject its conclusions so far as they may be dependent upon that theory. We have already indicated the respect in which a check transferred by a trustee as such differs from a case in which the infirmity does not appear on the face of the instrument.

The following cases are cited by the defendants: *Bank of California v. Portland Hide & Wool Co.,* 131 Or. 123, 282 Pac. 99 (1929); *Bank of California v. Young,* 123 Or. 95, 260 Pac. 227 (1927); *Bank of Jordan Valley v. Duncan,* 105 Or. 105, 209 Pac. 149 (1922); *McPherrin v. Tittle,* 36 Okla. 510, 129 Pac. 721, 44 L. R. A. (N. S.) 395 (1913); *Rivers Bros. v. C. F. T. Company,* 124 Or. 157, 264 Pac. 368 (1928); *Steele v. Bank of California,* 140 Or. 107, 9 Pac. (2d) 1053 (1932). None of them are in point. They set forth the general rule applicable under O. C. L. A., 69-406, which applies when the infirmity (fiduciary character of the transferor) does not appear on the face of the note. As said in *Bank of Jordan Valley v. Duncan,* supra.

"He has a right to purchase the note, provided he acts in good faith, without searching for defects *of which there is no indication on the face of the note* * * *." (Italics ours.)

For the purposes of this case, we hold that when a county treasurer in violation of his trust draws a check upon county funds, affixing after his signature the words "county treasurer", and delivers the same to the payee in payment of a personal and private obligation, the payee who accepts the benefits thereof is chargeable with notice of the trust relationship,

has a duty to make reasonable inquiry, and if no inquiry is made is charged with knowledge of what it would have disclosed. Although some well considered cases go further, we deem it unnecessary in the case at bar to state the rule more broadly. Our conclusion is supported by the following additional authorities, all of which were decided after the enactment of the Negotiable Instruments Law: *Washbon v. Hixon,* 87 Kan. 310, 124 Pac. 366 (1912) ; *Fidelity Co. of Maryland v. Farmers Bank of Bates County,* 44 Fed. (2d) 11 (1930) ; *Webb v. United States Fidelity & Guaranty Co.,* 165 Va. 388, 182 S. E. 557 (1935) ; *Owens v. Nagel,* 334 Ill. 96, 165 N. E. 165 (1929). The following authorities support the same conclusion but were decided prior to the enactment of the Negotiable Instruments Law: *Northern Trust Co. v. First National Bank of Buffalo,* 25 N. D. 74, 140 N. W. 705 (1913) ; *American Bonding Co. of Baltimore v. National Mechanics' Bank of Baltimore,* 97 Md. 598, 55 A. 395, 99 Am. St. Rep. 466 (1903) ; *State v. Jahraus* (La.). 117 La. 286, 41 So. 575, 116 Am. St. Rep. 208 (1906) ; *Prather v. Weissiger,* 73 Ky. 117 (1873), and see 61 A. L. R. 1389 annotation.

We now consider the somewhat technical objections of the defendants to the form of the allegations in the complaint. Has the plaintiff plead facts sufficient to entitle it to the benefit of the rule of law which we have enunciated? The allegation under attack is "that by the form of said check, said tax collector of defendant has notice and actual knowledge that by said payment the funds of Marion County, Oregon were being used for the personal use and benefit of said D. G. Drager   *   *   *."

An averment of knowledge is not a conclusion of law. *Heitkemper v. Schmeer,* supra. It is a statement

of fact, and an allegation of *actual* knowledge is not transformed into a mere conclusion of law by designating the source thereof. The signature of the check as "county treasurer" is positively alleged. Under the authorities cited that fact charged the payee with notice. The allegation was sufficient.

In *Heitkemper v. Schmeer,* supra, a deed was signed by the trustee as such and delivered to the grantee. It was held that it would be incumbent on the grantee to allege and prove as an affirmative defense that he was a bona fide purchaser. It was not necessary for plaintiff to allege notice.

> "It was sufficient to allege the existence of the trust, its nature and character and that the defendants had participated in its breach."

The court further held that even if notice was an essential element it was sufficiently alleged. The same ruling is applicable here.

■ It is alleged that the check was in payment of taxes against real property of which Drager was the record owner. Defendant received the payment. Both the form of the check and the records of his office put the payee on notice concerning the employment of trust funds and the application of them to a private purpose. The payee's conduct was prima facie wrongful. 2 Scott on Trusts, p. 1643. If the payee would avoid the conclusion that he is in the position of one taking with knowledge in a transaction prima facie wrongful, he must present some affirmative defense which will explain away his apparent wrongful participation, as for example by showing that he employed due diligence by investigating when thus put on inquiry.

■ Defendants insist that the payee was entitled to rely on the presumption that Drager was innocent of

crime and that the payee is presumed to have performed his official duty. The presumption of innocence cannot impair the sufficiency of a complaint charging guilt or participation therein. If it could, every criminal indictment would be demurrable. These presumptions are irrelevant as to the sufficiency of the pleading.

Again, defendants assert that

"There is nothing in the amended complaint to indicate that the money received by the sheriff for taxes was not applied by the sheriff according to his official duty and thus distributed to the various tax levying bodies * * *."

On the contrary, the complaint alleges that the money was had and received by the defendant, Multnomah County. It is lawful for a taxpayer to pay only the tax owing to a single municipal or quasi municipal corporation. *Milne v. Hess,* 141 Or. 469, 18 Pac. (2d) 229, 89 A. L. R. 711 (1933). And it is allegd in substance that this is what Drager did. If the defendant, Multnomah County, did not have and receive all of the funds covered by Drager's checks, but in fact paid portions of them to other tax levying bodies, that situation is not apparent on the face of the complaint, and the problem it would present is not before us. It is for this reason, among others, that we must overrule the demurrer of defendant Multnomah County on the alleged ground of defect of parties defendant. The defect, if any, does not appear. Furthermore, a demurrer upon that ground should, but did not, name the parties who should be joined. *State ex rel. v. Metschan,* 32 Or. 372, 53 Pac. 1071, 41 L. R. A. 692 (1896) ; *Wolf v. Eppenstein,* 71 Or. 1, 140 Pac. 751 (1914) ; *Whitney v. Whitney,* 114 Or. 102, 235 Pac. 293 (1925).

■ It is urged by defendants that neither the tax collector (sheriff) of Multnomah County nor the treasurer of the defendant City of Portland had any right to accept anything other than money in payment of taxes or city liens. It may be true that acceptance of a check in payment of taxes could not under the law be deemed payment if the check proved worthless. But here the checks were cashed, and the county and city got the money. The provision of the statute to which defendants refer has no application to this case. If it did, it would militate against them as beneficiaries of an unlawful act.

■ Defendants allege that "the circumstances [referring no doubt to the complaint] show that inquiry would have failed to disclose embezzlement" by Drager. It would appear that the simplest inquiry by defendants of Marion County officials would have disclosed whether or not Marion County had any interest in or had authorized the payment of taxes on Multnomah County land standing in Drager's name. We certainly cannot hold as a matter of law that inquiry would have been fruitless.

■ The next question relates to the right of the plaintiff surety company to stand in the shoes of Marion County and enforce the rights of the latter against the defendants. The plaintiff has paid the loss suffered by Marion County and claims by right of subrogation and also by right of an assignment. We need not consider defendants' contention that Marion County was without power to make an assignment, for assignment is unnecessary where the right of subrogation exists. *United States Fidelity & Guaranty Co. v. Bramwell*, 108 Or. 261, at 277 and 278, 217 Pac. 332, 32 A. L. R. 829 (1923). The principles upon which the right of subro-

gation rests have been adequately set forth in the Bramwell case, supra. We accept them as there stated. If plaintiff is to prevail it must show that the equities of the surety are clear and are superior to those of the defendants. What we have already said is conclusive also upon this issue of subrogation. If, as we have found, the defendant is in the position of one who knowingly accepted trust funds which were applied in the payment of a private obligation of the trustee, then the defendant was not a holder in due course, but on the contrary was a participant in a transaction prima facie wrongful. Under such circumstances the complaint discloses no equitable consideration in favor of the defendants which could defeat the plaintiff's right of subrogation.

This conclusion involves no inference of moral delinquency on the part of the sheriff of Multnomah County or the treasurer of the City of Portland, as claimed in defendants' brief. The payee in accepting Drager's official check as county treasurer and in applying it on Drager's tax obligation without making due inquiry simply took the payment at peril. If there was no misappropriation, then the acceptance would, unless an affirmative defense be established, impose the duty to repay what the county had received.

> "Proof of culpable negligence or morally wrongful conduct of third person is not essential to surety's subrogation as against third person who participated in original wrongful act or was negligent." Martin v. Federal Surety Co., 58 F. (2nd) 79 (1932), (headnote 9).

■ In *New Amsterdam Casualty Co. v. Robertson*, supra, the right of subrogation was assumed to exist. The plaintiff failed to recover because the school

district to whose rights the surety was subrogated was barred by estoppel. The right of subrogation is supported by the following authorities: *Bank of Giles County v. Fidelity & Deposit Co. of Maryland* (supra); *Fidelity & Deposit Co. v. Atchison, T. & S. F. Ry. Co.,* (supra); *Conqueror Trust Co. v. Fidelity & Deposit Co. of Maryland,* (supra); *Wasco Co. v. New England Equitable Ins. Co.,* 88 Or. 465, 172 Pac. 126, L. R. A. 1918D, 732, Ann. Cas. 1918E, 656 (1918); *United States Fidelity & Guaranty Co. v. Bramwell,* supra; 60 C. J. p. 764 § 76; Restatement of the Law of Security, p. 383, § 141 (c), comment a, p. 383 and 384, and comment on Clause (c), p. 389; *Hill v. Flemming,* supra; *Webb v. United States Fidelity and Guaranty Co.,* supra; *Fidelity and Deposit Co. of Maryland v. Farmers' Bank of Bates County,* supra; *American Bonding Co. of Baltimore v. National Mechanics' Bank of Baltimore,* supra; *Northern Trust Co. v. First National Bank of Buffalo,* supra; *United States Fidelity & Guaranty Co. v. Union Bank & Trust Co.,* 228 Fed. 448 (1915); *American Surety Co. v. Vann,* 135 Ark. 291, 205 S. W. 646 (1918); *Empire State Surety Co. v. Cohen,* 93 Misc. 299, 156 N. Y. S. 935 (1916).

The defendants cite numerous cases (all of which we have examined) in support of their contention that the plaintiff surety has no right of subrogation, even if it should be held that Marion County had a cause of action against the defendants. *Meyers v. Bank of America National Trust & Savings Association,* 11 Cal. (2d) 92, 77 Pac. (2d) 1084 (1938) is typical of these cases. In that case the office manager of the payee of checks forged the payee's name thereon and negotiated them with the defendant Wascher, who paid full value therefor. The manager embezzled the money. Wascher, in the ordinary course of busi-

ness, deposited the checks in his bank account with the defendant bank. The bank presented the checks to the drawee and received full payment. The surety who had guaranteed the fidelity of the office manager reimbursed the payee and suit was brought on the theory of subrogation. In denying the right of subrogation, the court said:

> "It must be conceded that the bank is an innocent third party, whose duty to the employer was based upon an entirely different theory of contract, with which the indemnitor was not in privity. Neither the indemnitor nor the bank was the wrongdoer, but by independent contract obligation each was liable to the employer. In equity, it cannot be said that the satisfaction by the bonding company of its primary liability should entitle it to recover against the bank upon a totally different liability. The bank, not being a wrongdoer, but in the ordinary course of banking business, paid money upon these checks, the genuineness of which it had no reason to doubt, and from which it received no benefits." *Meyers v. Bank of America National Trust & Savings Association,* supra, 11 Cal. (2d) at p. 102.

The Meyers case is not controlling here. In that case there was nothing on the face of the check to disclose that fiduciary funds were being used for private purposes, there was an intervening bona fide purchaser, and the bank received no benefit from the transaction. A different rule seems to be uniformly applied in the case of actions against a bank which has paid a check on a forged indorsement from that which governs in cases where the fiduciary nature of the fund expressly appears on the body of the instrument.

The following cases cited by the defendants, in which the surety was held not entitled to subrogation,

involved forged signatures upon instruments cashed by a bank without negligence: *Meyers v. Bank of America*, supra; *New York Title & Mortgage Co. v. First National Bank*, 51 F. (2d) 485, 77 A. L. R. 1052 (1931); *Baker v. American Surety Co.*, 181 Iowa 634, 159 N. W. 1044 (1916); *Washington Mechanics Savings Bank v. District Title Insurance Co.*, 65 F. (2d) 827 (1933); *American Surety Co. of New York v. Robinson*, 53 F. (2d) 22 (1931); *American Surety Co. of N. Y. v. Lewis State Bank*, 58 F. (2d) 559 (1932).

The early cases of *Powell v. Morrison,* 35 Mo. 244 and *Eyerman v. Second National Bank,* 84 Mo. 408, appear to be decided upon the ground that the words "sheriff", "School Treasurer" and the like when appended to a signature on an instrument are mere descriptio personae and do not give notice that the depositor holds the funds in trust. This doctrine was rejected by this court in the case of *McLeod v. Despain,* supra. Defendants rely strongly on the case of *Louisville Trust Co. v. Royal Indemnity Co.,* 230 Ky. 482, 20 S. W. (2d) 71. The manager of a corporation was under instructions to deposit checks in the name of the corporation in the Citizens Union National Bank of Louisville. In violation of his instructions he deposited checks to his own credit in the Louisville Trust Company. Some of the checks were payable to his employer. He then withdrew the money on his personal checks and embezzled it. The plaintiff surety company paid the loss to his employer and sought subrogation against the bank which was denied, but the court expressly distinguished that case from the case at bar in the following words:

"Nor is it a case where the surety of a trustee who paid the amount of its principal's default is permitted to follow the misappropriated trust fund and recover from a bank the amount thereof which

had been paid to the bank with knowledge of its trust character in settlement of a personal debt which the trustee owed the bank.''

*American Bonding Co. of Baltimore v. State Savings Bank,* 47 Mont. 332, 133 Pac. 367, 46 L. R. A. (N. S.) 557, cited by defendants is not in point. The face of the instrument in that case did not disclose any trust relationship. The bank profited in no way by the transaction.

■ The defendants cite O. C. L. A., 8-502, which reads as follows:

"When a public officer by official misconduct or neglect of duty shall forfeit his official undertaking or other security, or render his sureties therein liable upon such undertaking or other security, any person injured by such misconduct or neglect, or who is by law entitled to the benefit of the security, may maintain an action at law thereon in his own name, against the officer and his sureties, to recover the amount to which he may by reason thereof be entitled.''

Defendants argue that under this section Multnomah County and the City of Portland would have rights of action against the plaintiff surety company if Marion County had recovered from them. In other words, they assert that Drager's bond was given for the protection, among others, of Multnomah County and the City of Portland, and that therefore their equities are equal or superior to those of the surety company. But the right to sue accrues to a person *who is injured* by such misconduct. Since we have held that the defendants in the eyes of the law have participated in the wrongful conduct of Drager, they are in no position to claim that they are injured thereby.

■ Defendants next contend that the sheriff of Multnomah County and the treasurer of the City of Portland were not agents of the county and city, respectively, and that therefore notice to the sheriff and city treasurer did not constitute notice to the defendant county and city. These are not actions in which it is sought to hold the defendant county or city liable on the theory of respondeat superior on account of torts committed by agents. On the contrary, these are cases in which the county and city have received and appropriated funds to which they had no legal or moral right and which, in equity and good conscience, should have been returned to Marion County. They received the funds through the instrumentality of the sheriff and the city treasurer. The cases are governed by equitable considerations. Defendants cannot in equity and good conscience affirm the action of the sheriff and treasurer by retaining the money and at the same time disaffirm the knowledge with which those officers were chargeable. Furthermore, it is alleged in each complaint that the "defendant cashed said check." The face of the check so cashed disclosed the fiduciary capacity of the drawer, and the records of the sheriff's office and the city treasurer's office were certainly records of the county and city respectively. Those records disclosed that the lands upon which Drager was paying taxes and assessments were lands owned by Drager. The defendant county and city were chargeable with notice as fully as were the sheriff and city treasurer.

■ We have already observed that each defendant has demurred on the ground that it appears on the face of the respective complaints that certain causes of action which arose before dates specified in the demurrers are barred by the statute of limitations.

> "The limitation prescribed in this title shall not apply to actions brought in the name of the state, or any county, or other public corporation therein, or for its benefit * · * *." O. C. L. A., 1-211.

Under this section it has been held that the general statute of limitations does not run against the city. *Seeck v. City of Lebanon*, 148 Or. 291, at 292, 36 Pac. (2d) 334. In *United States Fidelity & Guaranty Co. v. Bramwell* (supra) it was held that subrogation gives to the subrogee "all of the rights, priorities, remedies, liens and securities, of the party for whom he is subrogated." The common law right of the sovereign to priority in payment over general creditors was held to accrue in favor of the subrogee of the state. In *American Bonding Co. of Baltimore v. National Mechanics' Bank of Baltimore*, 97, Md. 598, 55 A. 395, 99 Am. St. Rep. 466 (1903), it was held that

> "Where a surety on a clerk's official bond has paid the state a judgment recovered for the clerk's breach of trust, it is subrogated to every right of the state in respect to the claim, including the state's exemption from the running of limitation against it."

The same ruling was applied in *United States Fidelity and Guaranty Co. v. Union Bank and Trust Co.*, 228 Fed. 448. The authority of these cases is not weakened by *Citizen's Bank v. Fidelity and Deposit Co.*, 117 Fed. (2d) 852, as contended by the defendants.

The demurrers based upon the statute of limitations must be overruled. Since Marion County would not have been barred by the statute, it follows that the plaintiff surety company, being subrogated to all of the rights of Marion County is also not barred.

The final contention of the defendants is that plaintiff's claim is barred by laches. Plaintiff concedes that

it is the established law of this state that the sovereign is not exempt from the defense of laches. The question, however, is whether laches appears upon the face of the complaint.

■■ The complaints disclose that a long period of years has elapsed since the first of the alleged defalcations. It is the position of the defendants that the complaint is defective because it fails to explain away the asserted unreasonable delay. Before deciding this issue it is appropriate to consider whether plaintiff is properly in law or in equity. Although no question is raised upon demurrer concerning the form of this action, we have concluded after serious consideration that the plaintiff was entitled to sue in assumpsit as it has done. It is a form of remedy greatly favored by the courts. It is of an equitable nature and embraces cases "in which the plaintiff has equity and conscience on his side and the defendant is bound by ties of natural justice and equity to refund the money." 4 Am. Jur. p. 496 and 7, § 5. Being of an equitable nature this form of action admits of almost every defense to which a defendant is in equity and good conscience entitled. 7 C. J. S. p. 120 § 17. This court has entertained an action at law in at least two cases in which subrogation was sought by a surety upon facts very similar to those appearing here. In *U. S. Fidelity Company v. United States National Bank,* 80 Or. 361, 157 Pac. 155, L. R. A. 1916E, 610 (1916), the plaintiff was surety on a guardian's bond. The guardian had been maintaining two accounts in the defendant bank, one consisting of trust funds, the other personal. Having exhausted his personal account, the guardian continued to draw checks signed only as an individual. These, the bank improperly paid and charged against the guardianship account. The guard-

ian embezzled the money. The surety paid the loss to the estate and brought an action at law against the bank. This court said:

"1. Having, as surety, paid to the new guardian the amount of its principal's defalcation, the plaintiff is subrogated to all the rights of the trustee to whom the payment was made, for the purpose of reimbursing its loss; so that, if the last guardian had been entitled to call upon the defendant to pay the balance of the guardian account with it, the plaintiff may do so itself by virtue of the subrogation. This is true as a matter of law, and in this instance is placed beyond controversy by the assignment mentioned. No contention is urged on this point. It rests upon a well-recognized principle of law for the protection of sureties who are compelled to make good the defaults of those for whom they have given bonds."

It will be noted that this was an action not against the defaulting guardian but against a defendant who knowingly violated its duty and thereby participated in the wrong. See *New Amsterdam Casualty Co. v. Robertson*, supra. Although an assignment adds nothing to the substantive rights of the subrogee, still it may perhaps be persuasive of plaintiff's right to sue at law as intimated in the opinion quoted. As long ago as 1827 it was held that equity will compel a creditor to make an assignment to his surety subrogee so that the latter can sue at law. *Lidderdale's Executors v. Robinson*, 12 Wheat. 594, 6 L. Ed. 740.

■ Although there may be cases which would require the exercise of the powers of a chancellor to weigh the respective equities of the plaintiff and compare them with the equities of a fourth party defendant (as in the case of suit against a bank which has cashed a forged check), there is nothing which now appears from

the complaint in this case requiring action by a chancellor as distinguished from action by a court of law. The complaint shows that defendants were prima facie liable for participation in Drager's breach of trust. 2 Restatement of the Law of Trusts § 324 p. 969 and § 297 m., o., p. 912, both supra. If defendants would show that plaintiff is chargeable with laches, they must plead it.

In the case at bar, as in the United States Fidelity Company case, the plaintiff is suing at law. That being true, we think it was unnecessary for the plaintiff to offer in its complaint any explanation of the long lapse of time between the earliest of embezzlements and the date of suit.

If laches does not appear on the face of complaint, the defendant should set it up in order to give the plaintiff an opportunity to amend by inserting allegations explaining and excusing the delay. *Nelson v. Baker,* 112 Or. 79, 227 P. 301, 228 Pac. 916; *Tanous v. Johnston,* 113 Or. 343, 232 Pac. 793; *Weatherly v. Hochfeld,* 133 Or. 136, 286 Pac. 588. We find nothing in the complaint other than the apparent lapse of time which is suggestive of laches. Lapse of time does not necessarily imply unreasonable delay and it has been held that mere delay itself does not constitute laches unless the delay works to the injury of another. *Wills v. Nehalem Coal Company,* 52 Or. 70, 56 Pac. 528; *May v. Roberts,* 133 Or. 643, 286 Pac. 546. It has also been held that full knowledge of all the facts concurring with a delay for an unreasonable time are essential elements of the defense of laches, and we are not bound to presume that Marion County or the plaintiff surety company had knowledge of Drager's defalcations. *Wills v. Nehalem Coal Company,* supra.

In view of these considerations, it is unnecessary for us to decide whether the plaintiff would be required to negative laches in its complaint if this were a suit in equity. See *Wills v. Nehalem Coal Company*, 52 Or. at 91.

Since it does not appear from the complaint that Marion County would have been barred by laches if it had sued the defendants, there is no apparent ground for imputing laches to the plaintiff surety. The plaintiff made good the losses to Marion County on May 15, 1939, and brought this action in February 1940. No unreasonable delay on its part is apparent.

The demurrer to the respective complaints must be overruled, the judgments are reversed and the causes remanded to the circuit court for further proceedings conformable to this opinion.